646 F.2d 1220
 7 Bankr.Ct.Dec. 760, Bankr. L. Rep. P 67,963
 In re William C. BATEMAN, d/b/a Payless Bargain Center, Debtor.
CITY NATIONAL BANK OF FORT SMITH, ARKANSAS, Appellant,
v.
William C. BATEMAN, d/b/a Payless Bargain Center, Appellee.
 No. 80-1334.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 14, 1981.
Decided April 8, 1981.
 
 Harper, Young, Smith & Maurras, Fort Smith, Ark. by Robert Y. Cohen, II, Fort Smith, Ark., for appellant.
 Robert S. Blatt, Fort Smith, Ark., for appellee.
 Before BRIGHT, STEPHENSON and McMILLIAN, Circuit Judges.
 STEPHENSON, Circuit Judge.
 
 
 1
 Plaintiff-appellant City National Bank of Fort Smith, Arkansas, appeals from the dismissal by the district court[1] of its section 14(c)(4)[2] objection to the discharge of the defendant, William C. Bateman, from his debts. We agree with the contentions of City National and reverse the district court.
 
 I. FACTS
 
 2
 On April 22, 1973, William C. Bateman and his wife, Evelyn Bateman, borrowed $20,000 from City National Bank in order to purchase Albert Pike Grocery. This debt was secured by the assets of the grocery and by a first mortgage on the Batemans' home. William considered himself to be a co-owner of the store, along with Evelyn. The store had a joint business account and both William and Evelyn could write checks on that account. William performed butchering services and ordered inventory while Evelyn apparently attended to the balance of the business' demands. The store was profitable, and at the time of the loan to William for the purchase of Payless Bargain Center, Albert Pike Grocery was valued at between $27,000 and $28,000.
 
 
 3
 In 1977, William decided to purchase and operate another grocery store, the Payless Bargain Center. He borrowed $90,000 from City National Bank for this purpose on November 22, 1977. However, for this venture William incurred the indebtedness alone and secured the loan with the assets and inventory of Payless. Evelyn did not co-sign the loan and neither their home nor the assets of Albert Pike Grocery were pledged as security. William was the sole owner of Payless and Evelyn remained separate from the operation of Payless, except for performing bookkeeping services. William also greatly reduced his involvement in the operation of Albert Pike Grocery.
 
 
 4
 Although the Pike store had been successful, the Payless store was never profitable. In 1977, William claimed a loss on the Payless store of $6,644.18. On March 22, 1978, William paid the interest due on his $90,000 loan and advised the bank that he could not reduce the principal due to the fact that Payless had not turned a profit. On June 20, 1978, William again paid the accrued interest, but made no payment in reduction of the principal, again stating the business was unprofitable. In August and September of 1978, Payless suffered equipment breakdowns which William testified seriously affected sales. Inventory had declined in value from $62,203.14 on April 30, 1978, to $46,813.70 on January 1, 1979. In 1978, William's federal income tax reflected a loss of $13,621.63 on the operation of Payless and on March 19, 1979, William filed his voluntary petition for bankruptcy.
 
 
 5
 During this period, the Pike store was profitable. In 1977, the Pike store produced taxable income of $10,062.47 and in 1978, the store yielded taxable income of $6,380.08. In fact, the Pike store did well enough to satisfy the original $20,000 loan, which was paid off on April 27, 1978. The Pike store was incorporated as Albert Pike Grocery, Inc., effective on June 16, 1978. Prior to the incorporation, William transferred, for no consideration, his one-half interest in the Pike store to Evelyn.[3] After the transfer William was a director (along with Kenneth Bateman, a son) and secretary of Pike, although Evelyn was the sole shareholder, chairman of the board of directors, and president of the corporation.
 
 
 6
 There was also testimony regarding marital discord arising out of William's plans to purchase the Payless store. Evelyn was apparently vehemently opposed to the purchase because of the financial uncertainty and risk. Her disagreement with William on the purchase led to her seeking legal advice regarding a divorce. This was prevented, according to testimony by William, by his oral agreement to transfer his interest in the Pike store to Evelyn. The process of incorporation commenced in February 1978, when Evelyn sought legal advice on incorporating, and was completed in June 1978. As indicated above, Evelyn's fears were well founded, for during the entire period between the purported oral transfer and completion of the incorporation, Payless lost money and the $90,000 loan principal was never reduced.
 
 
 7
 Other facts relevant to the appeal are that (1) the tax returns for 1977 and 1978 showed William as the sole proprietor of Albert Pike Grocery; (2) the bankruptcy petition did not include William's income from the Pike store which he received within two years of bankruptcy; (3) the bankruptcy petition failed to indicate William's gift to Evelyn of his interest in the Pike store within one year of bankruptcy, as required; and (4) William was a director, officer, signatory on the corporate checking account, and salaried employee of Albert Pike Grocery, Inc.
 
 
 8
 After the filing of the bankruptcy petition, City National Bank objected to the discharge, based on section 14(c)(4) of the Bankruptcy Act. After conducting a hearing, the bankruptcy court held that the transfer was not made with the intent to hinder, delay and defraud creditors and dismissed the petition objecting to the discharge. The district court affirmed the bankruptcy judge and City National Bank appeals.
 
 II. TRANSFER CREATING PRESUMPTION
 
 9
 In order for an objection to discharge to be sustained, City National must satisfy several elements. The proof must show (1) that the act complained of was done within twelve months of the filing of the bankruptcy petition, (2) with intent to hinder, delay or defraud creditors, (3) that the act was done by the bankrupt, and (4) that the act consisted of transferring, removing, destroying or concealing any of bankrupt's property. 1A Collier on Bankruptcy P 14.45 (14th ed. 1978). If the proof is insufficient on any one of these essential elements, City National's objection cannot be sustained.
 
 
 10
 The evidence introduced clearly satisfies the first, third and fourth elements. The petition in bankruptcy was filed in March 1979. Although there is testimony that an oral transfer of William Bateman's interest in the Pike store was made to Evelyn in November 1977, William's testimony and brief disclose that the transfer was a continuing matter. The bankruptcy court found the transfer was completed at the time of the incorporation of Pike grocery in June 1978. Therefore, the transfer by bankrupt to his wife occurred within one year of the filing of the petition in bankruptcy. This one-half interest was clearly William's property and the act of transferring this property by William satisfies the third and fourth elements.
 
 
 11
 The second element can be supplied by a presumption arising out of William's act. This rule is stated in 1A Collier on Bankruptcy P 14.47 (14th ed. 1978), and was cited by both the bankruptcy judge and the district court: "The fact * * * that valuable property has been gratuitously transferred raises a presumption that such transfer was accompanied by the actual fraudulent intent necessary to bar a discharge under clause (4)." See Rothschild v. Lincoln Rochester Trust Co., 212 F.2d 584 (2d Cir. 1954). Further, upon a showing that the act alleged was in fact committed, the burden of rebutting the presumption shifts to the bankrupt. Shainman v. Shear's of Affton, Inc., 387 F.2d 33, 37 (8th Cir. 1967).[4] In Re Derrick, 228 F.Supp. 964, 965 (E.D.Ark.1964).
 
 
 12
 The evidence introduced at the hearing was sufficient to raise the presumption of fraudulent intent. William possessed a one-half interest in the Pike store and that store was valued at between $27,000 and $28,000 at the time William borrowed from the bank in order to purchase Payless. His interest was "valuable property." There is no assertion that any consideration was paid for the one-half interest. The transfer was gratuitous. The presumption then arose that the transfer was accompanied by the actual fraudulent intent necessary to bar a discharge. All of the elements necessary to sustain the objection were satisfied and the burden shifted to Bateman to rebut the presumption.
 
 III. EVIDENCE OFFERED TO REBUT PRESUMPTION
 
 13
 Bateman has raised three arguments in support of his attempt to rebut the presumption: (1) the transfer was done to ensure domestic peace and tranquility, (2) the transfer was done on advice of counsel, and (3) Bateman's good faith and innocence is shown by the fact that Payless was either making a profit or could reasonably be expected to make a profit when the transfer was made.
 
 
 14
 We first examine the contention that the transfer was done to quell marital discord between the Batemans arising out of the purchase of Payless. Evelyn Bateman was not called as a witness at the bankruptcy hearing, so only William's testimony is available. All William stated was that Evelyn objected to the purchase of Payless, and at one point William testified that "she even got to the point she went to see a lawyer about a divorce over it." There was no elaboration, and the bankruptcy judge found only that "he has testified that his wife violently opposed that (the purchase of Payless)." These fleeting references are hardly persuasive, particularly since the transfer was not completed, according to William, until June 16, 1978, nearly eight months after the dispute purportedly arose.
 
 
 15
 We next consider bankrupt's argument that the transfer was made on advice of counsel. Although William testified that the transfer began in November 1977, there was no testimony that counsel was consulted for any purpose at or before that time. In fact, the first time an attorney was contacted in regard to the transfer was in February 1978, three months after the commencement of the so-called "continuous transfer." Finally, the bankruptcy judge found that, "I think that he did this (the transfer) at a time when Albert Pike was paid off * * * I think he did it on the advice of Franklin Wilder (an attorney), or his accountant. So, the court finds that this was a technical fraudulent conveyance, and lacks the element of an intentional act." The Pike store was not paid off until April 1978. Therefore, the evidence refutes any contention that advice of counsel figured in the actual decision to transfer the interest.
 
 
 16
 We finally examine bankrupt's contention that innocence and good faith are shown by the favorable financial situation of Payless. Bateman asserts that the transfer began in November 1977, and was completed on June 16, 1978, when the Pike store was incorporated. Despite his attempts to explain the delay and the sequence of events, the timing of the various actions reinforces the presumption of fraud and refutes his arguments. First, the Payless store was simply never profitable. In 1977, after slightly more than one month of operation, the store reported a loss in excess of $6,000. The record shows that in early 1978, legal advice was sought regarding how to consummate the oral transfer and incorporation of the Pike store. On March 22, 1978, three weeks after some of the first incorporation documents were signed, William was forced to renew the note for $90,000 to City National Bank with no reduction of principal. Payless thus appears to have been unprofitable for the four months between November 1977 and March 1978.
 
 
 17
 The $20,000 loan on the Pike store was satisfied on April 22, 1978, eleven months prior to Bateman filing his petition in bankruptcy. Bateman testified that he deliberately waited until after the loan was paid off to incorporate the Pike store. It is difficult to determine whether Bateman had transferred his interest in the store at this point, but it is clear that there is no documentary evidence of a transfer prior to this time. Within two months, however, on June 16, 1978, the transfer and incorporation were purportedly consummated. Four days later, on June 20, 1978, William again was forced to renew his note to City National Bank. The loan officer testified Bateman informed him that the store still was not generating a profit.
 
 
 18
 In view of the timing of these events, Bateman's explanations do not rebut the presumption of fraud. His only evidence that sales were picking up was the state sales tax returns; but these show only gross sales, not profits, and none of his books or records were produced. Bateman claims that the transfer was made in good faith while the business was not in trouble, although four days after the transfer the loan was renewed for the second time with no reduction of principal because after seven months of operation the business had not yet turned a profit. The evidence shows that a valuable asset was transferred for no consideration at a time when Bateman was deeply in debt and while his business venture was performing poorly. The claim that good faith was shown by the lack of knowledge of the imminent demise of Payless is not supported in the record.
 
 
 19
 There is additional evidence in this case which reflects unfavorably upon Bateman's defense. First, Bateman reported on his federal income tax returns for both 1977 and 1978 that he was the sole proprietor of the Pike store. This is inconsistent with his claims that he orally commenced a transfer of his interest in the Pike store to Evelyn in November 1977, and the claim that the store was transferred to the corporation in June 1978. The evidence also raises an inference that the transfer was in form only, and that William considered himself as retaining control over the Pike store. William's testimony that he was merely following his accountant's advice is inadequate.
 
 
 20
 The omissions from the bankruptcy petition are likewise notable. Question 5 of the statement of affairs asks, "(w)hat amount of income, other than from operation of your business (Payless) have you received during each of the 2 years immediately preceding the filing of the original petition herein?" The answer given is "None," despite the fact that for 1977 and 1978 William showed income on his income tax returns as the sole proprietor of Albert Pike Grocery. Question 14 of the same form asks, "(h)ave you made any gifts, other than ordinary and usual presents to family members * * * during the year immediately preceding the filing of the original petition herein?" The answer given is "No," despite the alleged 1978 gift to Evelyn of the one-half interest in the Pike store.
 
 
 21
 William testified that he fully disclosed his affairs and relied upon advice of counsel in the preparation of the petition. However, reliance on counsel must be reasonable. Stephens v. Stinson, 292 F.2d 838 (9th Cir. 1961). Despite disclosure to counsel, a petitioner must still attest to the truth and completeness of answers given under oath. To exclude income and the gift from the bankruptcy petition under the circumstances was unreasonable.
 
 
 22
 We are mindful of the clearly erroneous standard applied to the bankruptcy court's findings of fact. Matter of PRS Products, Inc., 574 F.2d 414 (8th Cir. 1978). Nevertheless, on examination of the record, we are "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Bateman's explanations did not rebut the presumption which arose under section 14c. The district court therefore erred in affirming the bankruptcy court's finding that an intent to defraud[5] was not established. The objection to discharge is sustained.[6]
 
 
 23
 Reversed.
 
 
 
 [1]
 The Honorable Elsijane T. Roy, United States District Judge for the Western District of Arkansas
 
 
 [2]
 11 U.S.C. § 32(c)(4) (1976) (repealed Oct. 1, 1979)
 In pertinent part, this statute provides that:
 The court shall grant the discharge unless satisfied that the bankrupt has * * * (4) at any time subsequent to the first day of the twelve months immediately preceding the filing of the petition in bankruptcy, transferred, removed, destroyed, or concealed, or permitted to be removed, destroyed, or concealed, any of his property, with intent to hinder, delay, or defraud his creditors * * *.
 Id. The revised bankruptcy statute, 92 Stat. 2549 (1978), contains a similar provision. See 11 U.S.C. § 727(a)(2). Compare 1A Collier on Bankruptcy P 14.47 (14th ed. 1978) with 4 Collier on Bankruptcy P 727.02 (15th ed. 1980).
 
 
 [3]
 There was some discussion during oral arguments as to whether a transfer had in fact been made by William to Evelyn. Documentary evidence of the purported transfer of William's one-half interest in the Pike store to Evelyn, and then the transfer of the store to the corporation is unclear, and neither counsel was certain as to the transfer. However, as the question was neither briefed nor argued, we express no opinion regarding whether any transfer was in fact made, and proceed upon the assumption, as the parties have, that the transfers were made as alleged
 
 
 [4]
 Shainman v. Shear's of Affton, Inc., 387 F.2d 33, 37 (8th Cir. 1967), quotes the following from 1A Collier on Bankruptcy P 14.12 (14th ed. 1978):
 * * * The burden which shifts now upon a showing of reasonable grounds is not a burden of going forward with the evidence requiring the bankrupt to explain away natural inferences, but a burden of proving that he has not committed the objectionable acts with which he has been charged; the bankrupt now has the risk of ultimately persuading the court that the allegations in the specifications are untrue once the objector has shown that there are reasonable grounds for believing that the bankrupt has committed one or more of the acts enumerated in § 14c. If the evidence is in a state of substantial equilibrium, the discharge must be denied since the bankrupt has failed to carry his burden of proof.
 
 
 [5]
 The district court and bankruptcy court below also erred in ending its inquiry after it determined there was no intent to defraud. Section 14(c)(4) speaks in terms of intent to hinder, delay, or defraud creditors and therefore evidence of an intent to hinder or delay creditors appears sufficient. See In Re Rowe, 234 F.Supp. 114 (E.D.N.Y.1964) (relying on Shapiro v. Wilgus, 287 U.S. 348, 354, 53 S.Ct. 142, 144, 77 L.Ed. 355 (1932)); In Re Leach, 1 B.R. 775, 776-77 (Bkrtcy.D.Md.1980); In Re The David German Travel Service, Inc., 3 B.C.D. (CRR) 1143, 1144-45 (Bkrtcy.E.D.Pa.1977)
 
 
 [6]
 The evidence clearly established that the bankrupt's wife retained her one-half interest in the Pike store