In re Jerome L. STANKE, Debtor.

Norman E. Rouse, Trustee, Plaintiff,

v.

Jerome L Stanke, Defendant.

Bankruptcy No. 98–30919–JWV.
Adversary No. 99–3007–SW1.

United States Bankruptcy Court,
W.D. Missouri,
Southwestern Division.

May 4, 1999.

Norman E. Rouse, Joplin, MO, for plaintiff.

Raymond I. Plaster, Springfield, MO, for defendant.

## MEMORANDUM OPINION AND ORDER

JERRY VENTERS, Bankruptcy Judge.

This matter comes before the Court on the Objection to Discharge filed against the Debtor, Jerome L. Stanke, by the Chapter 7 Trustee, Norman E. Rouse ("Trustee"). The Trustee alleged that the Debtor failed to disclose assets or concealed assets, sold property of the bankruptcy estate, and transferred property within one year of the bankruptcy filing with the intent to hinder, delay, or defraud creditors, and that the Debtor should as a result be denied discharge in these Chapter 7 proceedings pursuant to the provisions of 11 U.S.C. § 727(a)(2)(A) and (B) and § 727(a)(4)(A). Upon consideration of all the evidence, the Court finds that the Trustee's Objection should be sustained and that the Debtor should be denied discharge.

The Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1334(b) and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (J). The following constitutes the Court's findings of fact and conclusions of law. Bankruptcy Rule 7052.

## FACTS

The Debtor, Jerome L. Stanke ("Debtor" or "Stanke"), filed for relief under Chapter 7 of the Bankruptcy Code on October 16, 1998. In his schedules, Stanke listed $1,220,000.00 of real property and $20,831.35 of personal property.[1] He listed secured debts of $587,014.00 and general unsecured debts of $217,764.24. On

---

1. Stanke claimed most of this property as exempt pursuant to 11 U.S.C. § 522(b)(2)(B), on grounds that the property was held by the Debtor and his non-filing spouse as tenants by the entireties. However, the properties had been conveyed by the Stankes, as husband and wife, to themselves as co-trustees of the Jerome L. Stanke Trust and the Carol M. Stanke Trust. The Court holds in a separate Order that their acts and conduct severed the tenancies by the entireties and sustains the

Schedule I, the Debtor stated that he was retired and that he and his non-filing spouse, Carol Stanke, had total monthly income of $4,871.83. Despite listing the names of three incorporated businesses in the caption of his Petition, the Debtor stated in his statement of financial affairs that he had not been engaged in business in the two years immediately preceding the filing of the bankruptcy, but indicated that he had substantial income (about $40,-000.00 a year) from Social Security and pension benefits and in rental income.

Stanke, who is 64 years old, spent most of his life in Wisconsin and had acquired a substantial amount of real property there and in Missouri. He retired approximately five years ago and he and his wife moved to Branson, Missouri, where they established a retirement home. His occupation was as a machinist and tool and die maker, but his avocation apparently was the buying, selling, and trading of perhaps anything and everything. Stanke was a self-described "horse trader."[2] He also was a tinkerer and apparently had the enviable talent of being able to fix or restore most everything mechanical.

The Trustee alleged that Stanke had concealed numerous assets, had transferred assets, and had failed to disclose numerous transfers of property. Most of the Trustee's allegations were disputed by the Debtor. Because of the multi-faceted aspects of the Trustee's allegations, the Court will address each of the allegations separately.

### 1. The Wisconsin property and the Blackhawk Credit Union debt

The Trustee first alleged that the Debtor failed to disclose as an asset a contract

for deed for the sale of certain real estate in Rock County, Wisconsin ("the Wisconsin property"), that he failed to disclose or list mortgages on that property held by the Blackhawk Credit Union, and that the Debtor closed on the contract for deed post-petition, paid off the mortgages, and failed to account to the Trustee for the sale or turn over the proceeds of sale to the Trustee, all in violation of § 727(a)(2)(A) and (B).

An abstract company's accounting placed in evidence by the Trustee showed that Stanke closed on a sale of the Wisconsin property in early November 1998, less than a month after Stanke filed his Chapter 7 Petition. The closing sale price for the property was $215,906.93 after a discount of $8,000.00, which Stanke apparently gave the buyer to induce an early payoff on the contract for deed. Out of the sales proceeds, Stanke paid the Blackhawk Credit Union $101,490.66 to satisfy the first mortgage and $30,346.32 to pay off a second mortgage which Stanke testified he had placed on the property approximately a month before he filed bankruptcy. After all closing costs were paid, Stanke received net proceeds from the sale of $827,637.95, which he neither turned over to the Trustee nor disclosed to the Trustee. Out of the net proceeds, Stanke testified that he used about $30,000.00 to pay off a second mortgage on his home in Branson, a payment which, incidentally, was not disclosed in the statement of financial affairs.

It is unclear whether the contract for deed on the Wisconsin property was owned by the Debtor individually or by the Debtor and his wife jointly. In any case,

---

Trustee's Objection to the Debtor's claim of exemptions.

**2.** The term "horse trader" is, unsurprisingly, not defined in Black's Law Dictionary. We did, however, find reference to the term in more general dictionaries. The Random House Dictionary defines "horse trader" as one "who is shrewd and clever at bargaining." THE RANDOM HOUSE DICTIONARY OF THE

ENGLISH LANGUAGE (2nd ed.1987). Apparently, the term originated in the United States some time in the early 1800s and originally had the literal meaning of "one who deals in horses," OXFORD ENGLISH DICTIONARY (2nd ed.1989), but over time, the meaning broadened to include "a hard and unfair bargainer," Id, as in "[t]he unfair horsetrader might have taken my scalp." L.S Garrard, WAH-TO-YAH 109 (1850).

the Debtor's interest in the contract for deed was not disclosed in the Debtor's schedules, nor were the mortgage debts to the credit union. Stanke testified that he thought he had told his attorney about the Wisconsin property and credit union debts and that he thought they were included in the schedules. Stanke admitted that he understood that he was not supposed to sell any of his assets during the bankruptcy proceedings.

### 2. Omission of household goods, tools, and other personal property

The Trustee alleged that Stanke failed to disclose on his bankruptcy schedules numerous items of personal property, including household goods, tools, equipment, and vehicles, and that these omissions were in violation of § 727(a)(4)(A). The Trustee placed in evidence a 12–page typewritten list of items (prepared by the Debtor and his wife at the Trustee's request) that were left out of the bankruptcy schedules.

Stanke's bankruptcy schedules listed only $455.00 worth of household goods owned jointly by the Debtor and his wife, whereas the list of omitted items produced by the Trustee was valued by the Debtor at several hundred dollars more. Stanke's schedules listed tools with a value of just $5.00, although the Trustee produced photographs of three rooms full of tools, machinery and equipment. The Debtor admitted that he had three "machine shops" in his house, and the pictures showed hundreds of items of tools, machines, spare parts, etc.

Stanke also did not disclose in his statement of financial affairs that he had in his house numerous items belonging to a local church, including church pews, a pulpit, numerous tables and chairs, and various small appliances, as well as crosses and hymnbooks. Stanke explained that a local church conducts services in the Stanke

home, that all of the church-related property belongs to the church, and that he simply did not think to disclose that property in his statement of financial affairs.

At the time he filed his bankruptcy petition, the Debtor was running advertisements in a local publication, Pennypower Shopping News, advertising numerous tools and pieces of equipment for sale. In the advertisements, Stanke advertised a lathe for sale for $2,500.00, but valued it in his schedules at $350.00. A screw machine advertised for $350.00 was valued in the schedules at $50.00, and a metal shaper advertised for $950.00 was scheduled at $75.00. A truck with snow plow was advertised for $2,800.00 and valued in the schedules at $350.00.[3]

The Debtor explained that he had been running "a continual rummage sale" at the time he filled out the schedules, and that he simply did not think to list all of the personal property. He stated that the rummage sale had been notably unsuccessful, because he had not been able to sell enough items to even pay his bankruptcy attorney's fees. He stated that the advertised prices were generally double what he expected to sell the items for, and that he intentionally inflated the advertised prices to "spark interest" in potential buyers.

### 3. Transfers of personal property prior to bankruptcy

The Trustee alleged that the Debtor transferred several items of personal property for little or no consideration to hinder, delay, or defraud creditors or, alternatively, that the Debtor concealed his ownership of numerous items by claiming that they had been transferred to others in payment for services rendered or in exchange for other property. The Trustee charged that both of these actions would be grounds for a denial of discharge under Bankruptcy Code § 727(a)(2)(A).

**3.** These items were not listed in Stanke's original schedules, but were included in amended schedules. The amended schedules were not filed until March 8, 1999, after the Trustee had filed his objection.

454

### A. Transfers to Don Lewallen

At the time of filing bankruptcy, the Debtor was advertising for sale a large truck trailer for $4,900.00 and a skidsteer for $10,000.00. That equipment, however, was not listed in the Debtor's bankruptcy schedules or statement of financial affairs, and the Trustee showed—and the Debtor admitted—that the equipment was in the Debtor's possession at that time. Stanke testified that he had transferred those items to a former employee, Don Lewallen, in early 1998 as payment for work Lewallen had performed as an equipment operator in the Debtor's excavating business and as payment for dirt that the Debtor had purchased from Lewallen. The Debtor testified that he thought he had owed Lewallen between $500.00 and $2,000.00, but was unable to specify exactly what the debt was for. No records were kept (or at least none was produced).

Lewallen subsequently testified that he, and not Stanke, was the true owner of a snow blade, a back hoe bucket, and a log splitter which were in the Debtor's possession when the Debtor filed bankruptcy, in addition to the truck trailer and skidsteer. According to Lewallen, all of these items (except the log splitter) had been transferred by Stanke to Lewallen in exchange for Lewallen's "working and other things." Lewallen testified that he was owed about $2,000.00 for his work and about $1,500.00 for dirt when Stanke transferred the skidsteer to him, and that he valued the skidsteer at about $3,500.00. Lewallen said he was not aware that Stanke was trying to sell the skidsteer for $10,000.00, but that if Stanke had been successful in selling it, Lewallen would happily have settled for the $3,500.00 he was owed and Stanke could have kept the balance. Lewallen and Stanke both testified that some of the items were in Stanke's possession at the time of filing because Stanke was making repairs to them.

In any event, the Debtor did not disclose in his statement of financial affairs that he had the truck trailer, skidsteer, snow blade, back hoe bucket and log splitter in his possession (as property of another), nor did he disclose that he had transferred those items (except the log splitter) to Lewallen within one year of filing bankruptcy.

### B. The track hoe

The Debtor testified that he traded a track hoe, a piece of heavy equipment used to dig ditches and take gravel out of creek beds, to Artie Ayres in July 1998 in exchange for two subdivision lots which the Debtor valued at $15,000.00. The evidence showed that Stanke paid a total of $15,251.25 for the track hoe in 1995, using a check drawn on a joint account with his wife, Carol Stanke, but the sales invoice was in the name of the Debtor only. When the track hoe was exchanged for the subdivision lots in July 1998, just over three months before the bankruptcy filing, the bill of sale was signed by Carol Stanke only and the contract to convey the subdivision lots ran in favor of Carol Stanke only. In contrast to the Debtor's testimony, Ayres testified that the subdivision lots were worth $15,000.00 each, or a total of $30,000.00. The bill of sale by which Carol Stanke purported to transfer the track hoe to Ayres indicated a value of $40,000.00 for the track hoe, which would represent a substantial increase in value over the $15,000.00 Stanke had paid for the track hoe three years earlier.

Despite having apparently traded the track hoe to Ayres, the Debtor continued to try to sell the track hoe to others by openly advertising it for sale. Ayres testified that he used the track hoe and wanted to continue using it, but he acknowledged that, if the Debtor had sold the track hoe, the deal would be off. Ayres said he did not have "a clear understanding" with Stanke as to what would be done if Stanke sold the track hoe, but said he had objected to Stanke's advertising the track hoe for sale. To further complicate matters, Ayres was unable to transfer the subdivision lots to either Carol Stanke or the

Debtor because the subdivision had not been platted; however, Ayres said that he is now able to transfer the lots. Ayres conceded that his inability to transfer the lots to the Stankes "was a weak spot" in the transaction.

From the evidence adduced, it is difficult to determine whether the Debtor or Ayres owned the track hoe and the subdivision lots at the time of the bankruptcy filing. Nevertheless, it is clear that (a) the Debtor did not list either the track hoe or the subdivision lots as assets in his bankruptcy schedules, (b) the Debtor did not disclose the alleged transfer of the track hoe to Ayres within the year preceding the filing, and (c) the Debtor did not disclose that he had the track hoe in his possession although it belonged to someone else.[4]

### C. The Isco dump truck

The Debtor testified that he transferred an Isco dump truck to his daughter, Bonnie Stanke, in exchange for accounting services that Bonnie had provided to the Stankes and to their businesses over the last 13 or 14 years. The truck was valued at $10,000.00, whereas the amount owed the daughter was between $3,000.00 and $5,000.00. The Debtor and Bonnie Stanke testified that the transfer occurred approximately a year before the bankruptcy filing. The Debtor first testified that he was not having troubles with creditors when the dump truck was transferred to his daughter; later, he testified that the transfer was made at a time when he was having problems paying his creditors. Nevertheless, because the Trustee has failed to prove that this transfer took place within a year of the bankruptcy filing, the Court will disregard this transfer, although the Court has serious reservations whether the transaction was a bona fide one.

### 4. Other nondisclosures

The Debtor failed to disclose as assets in his bankruptcy schedules two judgments, one for $6,000.00 and another for $31,000.00, that he had obtained in his favor. The $6,000.00 judgment apparently was obtained shortly before the bankruptcy filing, and the Debtor ran an execution or garnishment shortly after the bankruptcy filing in an attempt to collect on the judgment. None of this information was disclosed in the bankruptcy schedules.

In his original schedules, the Debtor listed a Prudential life insurance policy with a cash value of $8,000.00. The Trustee produced a statement from Prudential demonstrating that the Debtor had a life insurance policy with a net cash value of $21,543.41 (after payment of a policy loan of $209,267.66, which was not disclosed in the schedules). The Debtor explained that he had listed the cash value of the policy based on information provided by his agent. He did not give any reason for omitting the policy loan from the schedules.

### 5. Debtor's responses

The Debtor insisted that he had not tried to conceal any property or transfers from the Trustee, and that, after the § 341 meeting, he had brought a box of various documents and materials to a meeting with the Trustee. However, the Debtor did not adduce evidence as to what exactly was in the box of materials, and the Trustee did not testify. As evidence of his good faith, the Debtor pointed out that he had cooperated fully with the Trustee in the Trustee's inspection of his property, and that he had provided the Trustee with an itemized list (with approximate values) of all tools, household goods and the like that had been omitted from the bankruptcy sched-

---

4. The evidence was unclear as to the location of the track hoe at the time of filing. It apparently was not on the Debtor's property, but it does seem clear that the Debtor was actively attempting to sell the track hoe and therefore was exercising some degree of control over it or had a possessory interest in it. Whatever his claim over the equipment, it should have been disclosed.

ules. The Debtor noted that he had filed amended schedules generally disclosing the assets, transfers, etc., which had been omitted from the original schedules. However, these amended schedules were not filed until March 1999, well after the Trustee had uncovered most of the omitted items and after the Trustee had filed his Objection to Discharge.

The Debtor described himself as a "horse trader," a person who buys, sells, trades and exchanges all kinds of property, hopefully for a profit. Stanke testified that he bought, sold and traded more than $1,500,000.00 of property in one year (1989) and that trading things "is my normal activity." For these reasons, he did not list many of the items in his bankruptcy schedules. As for the omission of the many items of household goods and tools, Stanke testified that he did not think the property was worth anything because he had been advertising it for sale for at least three weeks and had been unable to sell it. The best offer he had received was an offer to haul everything away at no cost to him.

## DISCUSSION

11 U.S.C. § 727(a) provides:

(a) The court shall grant the debtor a discharge, unless—

* * *

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

* * *

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

Because a general discharge facilitates a debtor's "fresh start," one of the primary purposes of bankruptcy law, the discharge provisions are to be construed liberally in favor of the debtor and strictly against the objecting creditor or trustee. *In re Grayson,* 199 B.R. 397, 400 (Bankr. W.D.Mo.1996); *In re Parnes,* 200 B.R. 710, 714 (Bankr.N.D.Ga.1996). The grounds for denial of discharge must be proven specifically, and the proof must be directed at the transfer or concealment alleged; a debtor should not be denied a discharge on general equitable considerations. *Rice v. Matthews,* 342 F.2d 301, 304 (5th Cir.1965); *Gross v. Fidelity & Deposit Company of Maryland,* 302 F.2d 338, 340 (8th Cir.1962).

The plaintiff in an action under § 727 bears the burden of proving that the debtor is not entitled to a discharge. Bankruptcy Rule 4005. The plaintiff must prove his case by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 289, 111 S.Ct. 654, 660–661, 112 L.Ed.2d 755 (1991); *In re Hartman,* 181 B.R. 410, 412–413 (Bankr.W.D.Mo.1995).

### 1. Violation of § 727(a)(2)(A) and (B)

In order to prevail under § 727(a)(2)(A) the Trustee must prove: (1) that a transfer of property occurred; (2) that the property transferred was owned by the debtor; (3) that the transfer occurred within one year before the date the bankruptcy petition was filed; and (4) that the debtor had, at the time of the transfer, the intent to defraud a creditor. *In re Schroff,* 156 B.R. 250, 254 (Bankr.W.D.Mo. 1993). The elements for § 727(a)(2)(B) are substantially the same except that under § 727(a)(2)(B) the Trustee must prove that the debtor transferred property of the estate after the bankruptcy petition was

filed. Additionally, the fraudulent concealment of property will also be grounds for a denial of discharge under § 727(a)(2)(A) and (B). In this context, concealment entails the transfer of title while retaining some of the benefits of ownership. *Thibodeaux v. Olivier (In re Olivier)*, 819 F.2d 550, 553–554 (5th Cir.1987); *In re Lightfoot*, 152 B.R. 141, 146–47 (Bankr.S.D.Tex. 1993).

The first three elements are easily disposed of because of the Debtor's admissions, either in his schedules or in his testimony. Stanke readily admitted that he sold the Wisconsin property (by closing on the contract for deed) for $215,906.93 after the bankruptcy was filed and that he received $82,637.95 in net proceeds from the sale. The Debtor admitted that he transferred a large truck trailer, a skidsteer, a snow blade, and a back hoe bucket to Lewallen within one year of the Chapter 7 filing. He asserted that he transferred a track hoe to Ayres in July 1998 in exchange for two subdivision lots, lots to which the Debtor still has not received title. These facts, which have been fully discussed hereinabove, clearly establish violations of §§ 727(a)(2)(A) and (a)(2)(B).

 The final element, the debtor's intent to defraud creditors, may be proven by circumstantial evidence, *In re Schroff*, 156 B.R. 250, 254 (Bankr.W.D.Mo.1993); *In re Lightfoot*, 152 B.R. at 147, and will be presumed when the debtor has gratuitously conveyed valuable property to another. *Abbott Bank–Hemingford v. Armstrong (In re Armstrong )*, 931 F.2d 1233, 1239, reh'g denied (8th Cir.1991); *McCormick v. Security State Bank*, 822 F.2d 806, 808 (8th Cir.1987). If such a gratuitous transfer is shown, the burden shifts to the debtor to prove that it was not made with the intent to defraud, hinder or delay creditors. *Id; City National Bank of Fort Smith, Arkansas v. Bateman (In re Bateman )*, 646 F.2d 1220, 1222 (8th Cir.1981). Other factors considered in the determination of whether a debtor had the intent to defraud creditors include:

(1) lack or inadequacy of consideration;

(2) family, friendship, or other close relationship between transferor and transferee;

(3) retention of possession, benefit, or use of the property in question;

(4) financial condition of the transferor prior to and after transaction;

(5) conveyance of all of debtor's property;

(6) secrecy of the conveyance;

(7) existence of trust or trust relationship;

(8) existence or cumulative effect of pattern or series of transactions or course of conduct after pendency or threat of suit;

(9) instrument effecting the transfer suspiciously states it is in fact bona fide;

(10) debtor makes voluntary gift to family member; and

(11) general chronology of events and transactions under inquiry.

*In re Schroff*, 156 B.R. at 254–55 (quoting *In re Lightfoot*, 152 B.R. at 146–47).

 While any one of these factors can be a sufficient basis on which to find the requisite intent, *In re Titus*, 75 B.R. 256, 259–260 (Bankr.W.D.Mo.1985), the presence of more than one strongly indicates that the debtor did, in fact, possess the requisite intent. *Id.*

 The Court finds that the Trustee has met his burden of proving that the transfers were made with the intent to deceive and defraud creditors. First, the Trustee showed that, in several instances, the Debtor retained possession and use of the property in question. For example, Stanke continued to advertise for sale in a local publication several of the items that he had allegedly transferred to others in payment for goods and services, such as the skidsteer and the track hoe, without any clear understanding of how the sales proceeds would be divided in the event the Debtor was successful in selling the items.

The evidence raises serious questions in the Court's mind whether the items were actually transferred to others or whether the Debtor was still the true owner. Secondly, several of the alleged transfers were made for inadequate consideration. Examples of this are the alleged transfer of the track hoe, purportedly worth $40,-000.00, to Ayres for two unplatted subdivision lots worth either $15,000.00 (the Debtor's estimate) or $30,000.00 (Ayres's estimate), and the alleged transfer of a skidsteer worth $10,000.00 (the Debtor's estimate) to Lewallen in exchange for services and goods worth no more than $3,500.00. Third, several of the transactions were not disclosed and were kept secret by the Debtor. There were no documents to evidence or record the legitimacy of the transactions between the Debtor and Lewallen, although several pieces of equipment had supposedly been transferred to Lewallen. The Debtor did not disclose the various transactions on his bankruptcy schedules and statement of financial affairs, thereby concealing them from the Trustee and the Court.

When all of the conflicting and contradictory testimony is considered as to exactly what the Debtor did or did not transfer and did or did not own and did or did not disclose, the Court is left with the overwhelming impression that the Debtor played fast and loose with the truth in completing his bankruptcy schedules. In consideration of the general chronology of events and transactions, as set out in detail hereinabove, the Court concludes that the Debtor acted with the requisite intent to defraud his creditors and therefore should be denied discharge for violation of §§ 727(a)(2)(A) and (B).

### 2. *Violation of § 727(a)(4)(A)*

■ In order to prevail under § 727(a)(4)(A), the Trustee must prove that the Debtor made a false oath that was (1) fraudulent and (2) material. *Swicegood v. Ginn*, 924 F.2d 230, 232 (11th Cir.1991).

■ Under this section, a fraudulent statement must be made with a knowing intent to defraud creditors. *Swicegood*, 924 F.2d at 232. Deliberate omissions from the schedules may constitute false oaths and result in the denial of a discharge. *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir.1984). The plaintiff must demonstrate actual, not constructive, fraud. *Wines v. Wines (In re Wines)*, 997 F.2d 852, 856 (11th Cir. 1993). However, since defendants will rarely admit their fraudulent intent, actual intent may be inferred from circumstantial evidence. *Ingersoll v. Kriseman (In re Ingersoll)*, 124 B.R. 116, 123 (M.D.Fla. 1991). A series or pattern of errors or omissions may have a cumulative effect giving rise to an inference of an intent to deceive. *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992). On the other hand, the discharge is not to be denied when the untruth was the result of a mistake or inadvertence. *Beaubouef*, 966 F.2d at 178.

■ With these legal principles in mind, careful consideration of the evidence in this case leads the Court to the firm conviction that the numerous errors and omissions on the Debtor's schedules and statement of financial affairs were the result of an intent to deceive the Trustee and this Court. And, in fact, the Debtor did, for a period of time, succeed in his deceit, and it was largely through the diligent work and investigation of the Trustee that numerous transactions and assets have been uncovered. For these reasons, the Court will deny discharge.

First and foremost, the Debtor did not disclose the existence of the contract for deed which he (and apparently his wife) held with respect to property in Rock County, Wisconsin. Within 20 days of the filing of the bankruptcy, the Debtor closed the sale of that property for a total payment of $215,906.93, which reflected an $8,000.00 discount which the Debtor offered as an incentive for the buyer to pay off the contract early. Additionally, the

Debtor failed to list in his schedules the first and second mortgage debts to the Blackhawk Credit Union, in the amounts of $101,490.66 and $30,346.32, respectively. It is inconceivable that the Debtor would have simply forgotten or overlooked a property with such value ahd a debt of such magnitude, particularly since he listed several other properties and debts in smaller amounts. Furthermore, the $30,-346.32 second mortgage had been incurred just a month before the bankruptcy filing, and those funds had been used to pay off several credit card accounts, and those obviously preferential payments were shown in the statement of financial affairs. Also, it would seem that the closing on the sale most likely would have already been in the works at the time the Debtor filed his bankruptcy petition on October 16, 1998. Real estate closings normally take several weeks, but the Debtor received a letter dated November 2, 1998, from an abstract company in Wisconsin itemizing the payments that would be required in connection with the closing that was scheduled on November 6, 1998 (including the satisfaction of at least two outstanding judgments).

That the Debtor wanted to hide this transaction from the Trustee is underscored by the Debtor's use of the net sales proceeds of $82,637.95. Instead of turning the money over to the Trustee, or even advising him of its receipt, the Debtor paid off a second mortgage of some $30,000.00 on his and his wife's home in Branson. There was no evidence as to what happened to the remaining $52,000.00 of sales proceeds, but it is apparent the Trustee does not have that money. The Debtor's only explanation was that he thought the information was contained in the schedules.

Secondly, the Debtor failed to list scores of household goods and tools in the bankruptcy schedules and provided the Trustee with a list of that property only after the Trustee personally inspected the Debtor's home. When pressed by the Trustee, the Stankes produced a 12–page list of personal property that was not reflected in the schedules. Although the Debtor's schedules listed tools with a value of just $5.00, the Trustee produced photographs of three different shop and storage rooms in the Stankes' house that depicted several larger pieces of shop equipment and literally hundreds of spare parts, tools, etc. Many of these tools and pieces of equipment were being advertised for sale by Stanke in a local publication at prices that were seven or eight times the amounts he listed for their values on the list he eventually provided to the Trustee. The advertisements were being run by Stanke in the weeks immediately before and after he filed the bankruptcy, yet he inexplicably failed to list the property in his schedules. The values placed on the property by Stanke in his advertising are an indication of the value of the property, yet the Debtor testified that he didn't think the property was worth anything because he had not been able to sell it. Stanke's testimony is simply not credible.

Thirdly, there is the matter of the numerous purported transfers of various properties to Don Lewallen and Artie Ayres. Several of the items supposedly transferred to Lewallen in payment for work, dirt, and "other things," as Lewallen put it, were still in the Debtor's possession when the bankruptcy was filed and the Debtor was attempting to sell them, yet he failed to disclose these facts in the schedules, as required. Lewallen testified that the Debtor transferred a skidsteer worth $10,000.00 to Lewallen in payment for $3,500.00 worth of dirt and labor, yet the Debtor retained possession of the skidsteer and was trying to sell it for $10,-000.00. Had Stanke sold the skidsteer, Lewallen testified that he would happily have accepted $3,500.00 and Stanke could have kept the balance. Again, this testimony is simply not credible.

Similarly, the Debtor had supposedly traded a track hoe to Ayres in July 1998 in exchange for two subdivision lots, but the

Debtor failed to disclose this transaction and failed to list any interest in the lots in his schedules. Stanke testified that the lots were worth $15,000.00, although Ayres said they were worth $30,000.00. The bill of sale on the track hoe, which was given in exchange for the lots, valued the track hoe at $40,000.00. Despite having traded the track hoe, Stanke continued to try and sell it even though he did not have any agreement with Ayres concerning a possible sale.

The Debtor's continued possession of many of the items he supposedly transferred, his attempts to sell them as if they were his own, the lack of documentation for any of the transactions, and the inconsistencies in the testimony of everyone involved lead the Court to believe that the transfers and exchanges never took place at all, but if they did, they were intended to defraud the Debtor's many creditors, several of whom were suing Stanke or pressing him for payment. In any event, the Debtor never made at least three disclosures required by the Code: (1) the transfers, if they actually took place; (2) the ownership of the property, if the transfers did not take place; and (3) the possession of property belonging to others, if the transfers took place.

Fourth, the Debtor failed to disclose that he had two outstanding judgments in his favor, one for $6,000.00 and one for $31,000.00. On the $6,000.00 judgment, he was running an execution or garnishment at the time of or shortly after the bankruptcy was filed, so it is obvious he was aware of its existence. Stanke failed to accurately list the cash surrender value of a life insurance policy; he listed the cash value at $8,000.00, but the truth was that the cash value was $21,543.41. He failed to disclose the ownership of several rooms full of tools and equipment. He failed to disclose his interest in the two subdivision lots supposedly received from Ayres in July 1998. No excuse was offered for failing to list or accurately disclose the value of these assets.

Finally, the Debtor failed to disclose two mortgage debts to the Blackhawk Credit Union totaling more than $139,000.00, one of which had been incurred just 30 days or so before he filed bankruptcy. And he failed to disclose a loan against his insurance policy of more than $200,000.00. Because of the substantial amounts of these debts, it is inconceivable that the Debtor would have omitted them unless there was some intent to deceive the Trustee and creditors.

From all the circumstances, taking into account the many glaring omissions from the schedules, the conclusion is inescapable that Stanke acted with an intent to deceive and mislead the Trustee and prevent the Trustee from discovering all of his assets. Clearly, the Debtor's actions were fraudulent.

Also, the omissions were material. The omissions ranged from miscellaneous tools and household goods to a $6,000.00 judgment to a contract for deed on property in Wisconsin worth over $200,000.00. Conservatively, the Debtor omitted assets worth between $250,000.00 and $300,000.00. "The subject matter of a false oath is material, and thus sufficient to bar discharge if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Palatine National Bank of Palatine, Illinois v. Olson (In re Olson )*, 916 F.2d 481, 484 (8th Cir. 1990) (quoting *Chalik v. Moorefield (In re Moorefield )*, 748 F.2d 616, 618 (11th Cir. 1984)).

## CONCLUSION

For the reasons set out herein, the Court is convinced that the Debtor has concealed assets, has failed to disclose assets, has sold property of the bankruptcy estate, and has transferred property with the intent to deceive and defraud creditors and the Trustee, all in violation of §§ 727(a)(2)(A) and (B) and 727(a)(4)(A),

and that the Debtor should be denied a discharge. Therefore, it is

ORDERED that the Trustee's Objection to Discharge is SUSTAINED, and the Debtor is hereby denied a general discharge pursuant to §§ 727(a)(2)(A) and (B) and 727(a)(4)(A).

The Clerk shall enter judgment in accordance with this Order.

SO ORDERED.