**In re Michael V. DOWNEY and Barbara E. Downey, Debtors.**

**Louis W. Palmer and Marilyn J. Palmer Plaintiffs,**

**v.**

**Michael V. Downey and Barbara E. Downey, Defendants.**

**Bankruptcy No. 98–20075. Adversary No. 98–6128.**

United States Bankruptcy Court, D. Idaho.

Oct. 28, 1999.

Bruce A. Anderson, Elsaesser Jarzabek Anderson & Marks, Sandpoint, Idaho, for Plaintiffs.

Daniel P. O'Rourke, Southwell & O'Rourke, Spokane, Washington, for Defendants.

## MEMORANDUM OF DECISION, FINDINGS OF FACT AND CONCLUSIONS OF LAW, AND ORDER

TERRY L. MYERS, Bankruptcy Judge.

Plaintiffs Louis and Marilyn Palmer ("Palmers") seek to deny the discharge of debtors Michael and Barbara Downey ("Downeys" or "Debtors") pursuant to § 727(a)(4) of the Code. Trial having been held, and the Court having evaluated the evidence submitted at trial and the arguments of the parties, this decision constitutes the Court's findings of fact and conclusions of law. Fed.R.Bankr.Proc. 7052.

### BACKGROUND

The Palmers timely filed a complaint objecting to entry of discharge. The sole cause of action asserted is under § 727(a)(4)(A), which provides:

(A) The court shall grant the debtor a discharge, unless—

. . .

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account [.]

The Palmers allege that the Downeys' schedules and statements filed with the Court were materially, knowingly and fraudulently false in seven separate regards. The Palmers allege the Downeys:

(1) failed to disclose their interest in "Downey LLC;"

(2) failed to disclose their interest in or ownership of "Downey Transportation Services;"

(3) failed to disclose as an asset a $40,000 retirement account;

(4) failed to disclose property received from B & M Trucking, Inc.;

(5) failed to disclose the true value of the stock of "Loftin Agencies;"

(6) failed to disclose an interest in a $10,000 bond, including an allegedly refundable premium paid for that bond; and

(7) failed to disclose a debt to Herbert Loftin of $ 6,000.

Two related issues were tried. These were not issues identified in the pleadings, but the Court concludes that they relate sufficiently to the issues of nondisclosure pleaded that the Debtors' objection to considering them in this litigation shall be denied. They were that the Downeys failed to disclose transfers, in the period shortly preceding filing, of assets to "Denominator Enterprises, Inc." (an entity composed of Mrs. Downey's brothers), and that the Downeys failed to accurately disclose their income and expenses on schedules I and J.

## FINDINGS OF FACT

### A. The Palmers' claims

The Palmers owned and ran a trucking operation, B & M Trucking, Inc., dba Kootenai Valley Trucking ("B & M") in northern Idaho. Michael Downey worked for the Palmers for about one and one-half years when, in May 1997, the Downeys entered into an agreement to buy out the Palmers. The Downeys' obligations of $235,000 for the business assets of B & M, acquired by way of buying the stock of that entity, and $150,000 for the acquisition of the business' real estate were secured by the stock and real estate, respectively. The Downeys were also obligated to pay the Palmers $100,000 for a noncompetition covenant; this debt was unsecured. Collectively, payment amounted to $3,900 per month. The Palmers' secured claims were contractually subordinated to the Downeys' SBA-guaranteed debt to Mountain West Bank.[1]

The transaction closed in June 1997 but, by October of that year, the Downeys had ceased making payments to the Palmers on all but one note, and soon ceased paying it as well. The bulk of the assets of B & M were surrendered to lenders (other than the Palmers) in early 1998, and have been liquidated. The Palmers were sub-

stantial creditors of the Downeys when the chapter 7 petition was filed on February 4, 1998.

The Palmers' claim was large enough, and the impact on them from the Downeys' defaults significant enough, that they had reason to review the bankruptcy filing with care. In doing so, they discovered what they believed to be numerous errors and omissions.

### B. Herbert Loftin

Herbert Loftin owned and operated as a sole proprietorship Loftin Agencies, a freight brokerage business, for many years until September 1993 when he sold it to the Downeys. The purchase price was $80,000 of which $40,000 was allocated to the customer list and good will, $10,000 to hard assets, and $30,000 to Loftin's covenant not to compete.

Loftin, in this transaction, transferred his ICC operating authority to Downey. No specific portion of the purchase price was allocated to the authority. The Downeys, in August, 1995, incorporated Loftin Agencies, Inc. The authority was not transferred to the corporation, and was at all material times held by Michael Downey personally. The authority was disclosed on schedule B, and given a value of $300, and it was also claimed by the Downeys on their schedule C as exempt.

Loftin's debt was serviced through an escrow account. The Downeys remained current (for the most part) on this debt. They did not list the obligation to Herbert Loftin in the bankruptcy, though they did list a number of other Loftin Agencies-related debt.

### C. Loftin Agencies, Inc.

The Downeys disclosed their 100% ownership of Loftin Agencies, Inc. in their

---

1. Whether subordinated in whole or in part, or subordinated at the inception of the Downeys' SBA-guaranteed loan or only at the time

Mountain West Bank sought to recover on the loan, is of no consequence to this decision.

schedule B. They asserted this stock, and thus the corporation, had no value.

The book and tax values of the corporation as of December 31, 1997, as established by the Downeys' accountant, Michael Bibin, reflect an equity value of approximately $41,000. While these equity figures exclude accounts receivable and accounts payable (because the books were kept, and taxes paid, on a cash rather than accrual basis), the net effect of inclusion of receivables and payables, according to the evidence, would still yield a positive equity value.

Tom Richardson, a CPA hired by the Palmers, evaluated the financial records of Loftin Agencies. His testimony, and those records, support the conclusion that there was a value to the ownership of this corporation. He calculated $55,000.00 of equity existed in this corporation as of the date of the bankruptcy filing. This is consistent with tax and book values as of year-end 1997. There was no proof that events occurring in the 35 days following the year-end rendered the corporation worthless.

The Downeys however allege that a "zero" value was reasonable based on their "balance sheet approach" to the corporation which, they assert, takes into consideration a guaranty by Loftin Agencies, Inc. of B & M debt. Though a Loftin Agencies' guaranty of B & M debt to Mountain West Bank existed, the alleged impact of this contingent liability, i.e., that it eliminated any net equity value in Loftin Agencies, was not proven.

Loftin Agencies also had value in its customer lists. The value of that asset, over time, may have varied from the amount ascribed to it in the 1993 purchase agreement. But customer lists, along with an ICC authority and a phone, form the basis of a brokerage business. There is substantial similarity in the customer lists used pre-bankruptcy by Loftin Agencies and immediately post-bankruptcy by the Downeys.

On January 21, 1998, the Downeys leased the Loftin-related but personally held ICC authority needed for operating a brokerage. The lease was to Denominator Enterprises, Inc., a business operated by the Zarownys (Mrs. Downey's brothers). The lease was for $595, and was open-ended, without stated term. There was no reasoned basis for the amount charged for the lease. Nor was there an explanation why the value of the authority, at the time of filing, was one-half of this lease amount.

At approximately the same time as the transfer to Denominator of the ICC authority, the Downeys caused Loftin Agencies to sell its accounts receivable at 50% of face value to Denominator. Downey testified, in support of the bona fides of this sale to Denominator, that he contacted two other potential buyers for the accounts (though he couldn't remember who they were), but found the terms they offered unacceptable because of anticipated delay in receiving payment from these buyers. He thus elected to sell to Denominator. He did not testify as to how quickly the Zarownys paid, or the use the Downeys or Loftin Agencies made of the cash received. There also was no evidence as to the aging of the receivables or the propriety of this discount, or otherwise supporting the adequacy of consideration received.

Mr. Downey testified that Loftin Agencies was "shut down" on or about January 15, 1998, because the business just couldn't make it. The conclusion that the business could no longer profitably operate was not adequately explained. It is contradicted by evidence that the business generated income in 1997, including Mr. Richardson's analysis of the operations from the financial records, and Mr. Bibin's year-end statements. Downey Transportation Services was also able to generate sizeable revenues in the months immediately following filing. Financial statements provided by the Downeys to First Security Bank and Mountain West Bank less than a year earlier showed both income from, and value to, this business.

From and after the receivable purchase and the lease of authority, the Zarownys conducted their Denominator business out of the Downeys' basement.[2] According to the Downeys, the Zarownys were also paying the Downeys' living expenses in January, 1998, since the Downeys "had no income." In fact, they assert that the Zarownys lent them $5,000.[3]

The Zarownys threw in the towel on approximately February 3, three weeks after their purchase of the accounts receivable and two weeks after their lease of the ICC authority.[4] The Downeys' bankruptcy was filed on February 4. Mr. Downey recommenced the brokerage business the morning of February 5.

### D. B & M Trucking

The trucking business, B & M, was run separately from Loftin Agencies, though there were apparently inter-corporate transfers. Loftin Agencies brokered loads for B & M, but also for other carriers.

In January 1998, the Downeys shut down B & M, and surrendered its collateralized assets to lenders, primarily Mountain West Bank. Some of the recovery of collateral by the bank occurred after the bankruptcy filing, and the Downeys had possession of some B & M assets, such as office equipment, computers and desks when they filed their petition for relief. The value of this property appears to be less than $1,000. The Downeys' possession of these assets was not disclosed in the schedules or in response to question no. 14 on the statement of affairs.

### E. "Downey LLC"

The entity described as "Downey LLC" was never formed. Michael Downey testi-fied, in regard to Downey LLC, that this entity was intended to hold, and service, the Debtors' real estate interests. Several "rent" checks were received in late 1997, and one in January 1998, made payable to Downey LLC. They were deposited to a Downey LLC checking account. But except for the checking account, there was no formation of or business by this LLC. The Downeys did not disclose the LLC. Nor did they disclose the checking account, though they knew at the time of the filing of the bankruptcy that the LLC hadn't been formed, and thus had to know the funds in the account were not those of another, non-debtor entity.

### F. "Downey Transportation Services"

The Downeys filed their petition for relief on February 4, 1998. On February 5, Downey commenced business as Michael Downey Enterprises and/or Downey Transportation Services.[5] Phone records indicate that calls were placed by Mr. Downey to broker loads commencing at approximately 8:00 a.m. on February 5.

Mr. Downey testified that Downey Transportation Services was formed the day after the bankruptcy filing based on (1) an epiphany of sorts he had while returning from his lawyer's office on February 4 after signing the bankruptcy papers, to the effect that he had to make a living in some fashion post-bankruptcy, and (2) the coincidental timing of the Zarownys' discovery that the Denominator business wasn't "working out" and the Zarownys' agreement on February 3 to return to the Downeys the leased ICC au-

---

2. This is based solely on Mr. Downeys' testimony. There was no corroborative evidence of the Zarownys' conduct of business, or even that it was under the name of Denominator rather than Loftin Agencies.

3. This debt is not scheduled by Debtors in the bankruptcy.

4. The contention is that they just couldn't make a go of the business. How this squares with the $5,000 loan and the payment of the Debtors' expenses was not explained.

5. Ultimately, it was known as Downey Transportation Services. This proprietorship was incorporated in January, 1999.

thority.[6]

On February 5, Downey contacted the ICC about changing the authority from "Michael V. Downey, dba Loftin Agencies" to "Michael V. Downey, dba Downey Transportation Services". He further represented in this communication to the ICC, "I am a sole proprietorship and there is no change in the ownership, management, or control of the business."

The bankruptcy schedules filed on February 4 showed both Michael and Barbara Downey as unemployed, with neither having any income whatsoever. There was no amendment made to disclose the recommencement of their brokerage business the morning after filing.

### G. Other disclosure issues

It is uncontested that the schedules and statements filed on February 4 also did not reflect: (a) any retirement accounts; (b) any Loftin-related bond; or (c) funds held in bank accounts other than $5.00 in an unidentified account as shown on schedule B(2).

The Downeys admit that they held an interest in $47,500 in retirement funds as of filing. They also had a surety bond in place as of filing. In addition to the one open (but unidentified) bank account alluded to on schedule B(2), and one closed account referred to in response to question no. 11 on the statement of affairs, there were several other accounts in the name of the Downeys or Downey LLC.

### CONCLUSIONS OF LAW

The Downeys knowingly and fraudulently made false oaths and accounts in the

**6.** This coincidental timing is also the alleged reason for non-disclosure of the lease of the ICC authority, i.e., the lease was terminated and the authority again an asset of the Debtors. They listed the same on schedules B and C though at a value one-half of the amount charged for its lease.

**7.** The Court also concludes that the Downeys' response to question no. 17(d) of the statement of affairs was false, as the evidence reflects two financial statements issued within the year prior to filing of the petition. This

schedules and statement of affairs by their failure to fully and accurately disclose:

(A) their interest in funds held under the name "Downey LLC;"

(B) their existing and ongoing interests in their brokerage business, originally operated under the name of Loftin Agencies and later under the name Downey Transportation Services, including their income derived therefrom, their interest in the bond, and the value of the ICC authority used therein;

(C) their retirement accounts;

(D) their possession of the B & M assets;

(E) the value of Loftin Agencies, Inc. and their interests therein; and

(F) their debt to Herbert Loftin.[7]

Discharge shall therefore be denied under § 727(a)(4)(A).

### APPLICABLE LAW

#### a. In general

 Objections to discharge are liberally construed in favor of debtors, and strictly against the objectors. *In re Bernard*, 96 F.3d 1279, 1281 (9th Cir.1996); *In re Devers*, 759 F.2d 751, 754 (9th Cir.1985); *Weiner v. Perry, Settles & Lawson, Inc. (In re Weiner)*, 208 B.R. 69, 71–72 (9th Cir. BAP 1997), *rev'd on other grounds*, 161 F.3d 1216 (9th Cir.1998) [8]; *McVay & Corrigan v. Barnetche*, 98.2 I.B.C.R. 37 (Bankr.D.Idaho 1998). This is in keeping with the purpose of providing debtors with a "fresh start," and recognizes that denial of discharge is one of the harshest remedies under the bankruptcy laws. *Weiner*,

however was not one of the grounds alleged by the Palmers.

**8.** The Court of Appeals reversed *Weiner* on an abuse of discretion issue, when the trial court did not reconsider its earlier ruling upon post-trial information that the asset was not undervalued after all. But the Bankruptcy Appellate Panel's discussion of the standards applicable to discharge litigation was not impacted.

161 F.3d at 1218; *Bernard,* 96 F.3d at 1281; *Devers,* 759 F.2d at 754.

However, despite this favorable construction, bankruptcy discharge is equitable in nature, and is intended only for honest debtors. *Bernard,* 96 F.3d at 1283. And while this favorable construction attends, the objector must only prove the elements of the cause of action by a preponderance of the evidence; no heightened evidentiary burden is imposed. *Grogan v. Garner,* 498 U.S. 279, 284, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). *See also,* Fed. R.Bankr.Proc. 4005; *In re Lawler,* 141 B.R. 425, 429 (9th Cir. BAP 1992).[9]

**b. Denial of discharge under § 727(a)(4)(A)**

Denial of a debtor's discharge under § 727(a)(4)(A) requires proof that the debtor knowingly and fraudulently made a false oath or account. *In re Aubrey,* 111 B.R. 268, 274 (9th Cir. BAP 1990). The false oath need not be through live testimony. False statements on a debtor's schedules and statement of affairs, which are signed under penalty of perjury, will suffice. *In re Chalik,* 748 F.2d 616, 618 (11th Cir.1984); *In re Stanke,* 234 B.R. 449, 458 (Bankr.W.D.Mo. 1999); *In re Grondin,* 232 B.R. 274, 276 (1st Cir. BAP 1999). There also need not be any "pattern" of falsehoods in order to sustain an action under this section; a single false oath will suffice. *Grondin,* 232 B.R. at 277.

**1. "Knowingly" and "fraudulently"**

A statement is made with knowledge if it is known to the debtor to be false, or made without a belief in its truth,

or made with a reckless disregard of its truth. *In re Sears,* 225 B.R. 270, 274 (Bankr.D.R.I.1998).

Proof that the statement was fraudulently made requires actual subjective intent, not objective or constructive intent. *In re Adeeb,* 787 F.2d 1339, 1343 (9th Cir.1986); *In re Mereshian,* 200 B.R. 342, 345 (9th Cir. BAP 1986); *East Idaho Federal Credit Union v. Thomason,* 225 B.R. 751, 98.3 I.B.C.R. 77 (Bankr.D.Idaho 1998). Because it is rare that a debtor admits such intent, making it provable through direct evidence, intent may be established through circumstantial evidence, including inferences from the debtor's conduct, all surrounding circumstances, and the apparent course of conduct. *Devers,* 759 F.2d at 754; *Thomason,* 225 B.R. at 751, 98.3 I.B.C.R. at 77. *See also, Matter of Yonikus,* 974 F.2d 901, 905 (7th Cir.1992) (citing *Devers* ); *Sears,* 225 B.R. at 274.

**2. Omitted assets and false statements in schedules**

The function of the requirement of full and complete disclosure, enforced inter alia by way of § 727(a)(4), is to ensure accurate and dependable information is provided to the Court, trustee, and creditors upon which they can rely without the need for additional inquiry. *Aubrey,* 111 B.R. at 274; *Weiner,* 208 B.R. at 71–72; *Barnetche,* 98.3 I.B.C.R. at 38; *In re King* 82 I.B.C.R. 171, 172 (Bankr.D.Idaho 1982).

It is not for the debtors to elect what to disclose; all property and interests in property must be disclosed. *In re Tripp,* 224 B.R. 95, 98 (Bankr.

---

**9.** The Bankruptcy Appellate Panel recently stated:

While "Section 727 'is the heart of the fresh start provisions of the bankruptcy law[,]' " *Lawson v. Hughes (In re Lawson),* 193 B.R. 520, 523 (9th Cir. BAP 1996), *aff'd,* 122 F.3d 1237 (9th Cir.1997) (citations omitted), and must be construed liberally in favor of the debtor and strictly against the objector, *First Beverly Bank v.*

*Adeeb (In re Adeeb),* 787 F.2d 1339, 1342 (9th Cir.1986), and while bankruptcy courts are reluctant to deny a discharge absent a persuasive showing, still, the burden of proof is a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 284, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

*In re Beauchamp,* 236 B.R. 727, 730 (9th Cir. BAP 1999).

N.D.Iowa 1998); *In re Guajardo,* 215 B.R. 739, 742 (Bankr.W.D.Ark.1997); *In re Craig,* 195 B.R. 443 (Bankr.D.N.D.1996). *See also, Yonikus,* 974 F.2d at 904 (debtors have an absolute duty to report whatever interests they hold in property even if they believe assets are worthless or unavailable to the estate.) [10]

### 3. Materiality

■■■■■■ The Panel in *Weiner* states:

In determining whether the false statement is material, the court looks to whether the statement bears a relationship to the debtor's estate, and concerns the discovery of assets, or the existence and disposition of his property. See *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 618 (11th Cir.1984). "The recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless relationship or holding; such a defense is specious." *Id.* at 618.

208 B.R. at 72. *See also, In re Coombs,* 193 B.R. 557, 565 (Bankr.S.D.Cal.1996); *Stanke,* 234 B.R. at 460. It is not the asset's value that must be "material," it is that the false statement must relate materially to the debtor's financial affairs or the bankruptcy process. *Aubrey,* 111 B.R. at 274. "Furthermore, a debtor need not succeed in harming creditors to warrant denial of discharge because 'lack of injury to creditors is irrelevant for purposes of denying a discharge in bankruptcy.'" *Bernard,* 96 F.3d at 1281–82 (quoting *Adeeb,* 787 F.2d at 1343.)

### c. The need for credible explanation

■■■ *Aubrey,* in addressing a § 727(a)(4)(A) action, stated:

In a case under §§ 727(a)(3) and (5), the 7th Circuit defined the debtor's burden of production as follows:

The speculation of the bankruptcy judge or the creditors as to what may actually have been occurring is not an adequate substitute for a believable explanation by the debtor. The evidence in this case which could satisfactorily explain the events in question is far more likely to lie in the hands of a debtor than of the creditor.... To the extent that the debtor can explain these events he has an obligation to come forward and do so—he cannot abuse the bankruptcy process by obfuscating the true nature of his affairs and then refusing to provide a credible explanation.

[*First Federated Life Insurance Co. v.*] *Martin,* 698 F.2d [883] at 888 (7th Cir. 1983).

Like the creditor in *Martin,* Thomas can not be expected to prove the negative, i.e., the nonexistence of Aubrey's alleged debt to Noble. Any evidence substantiating Aubrey's alleged debt to Noble is far more likely to lie in Aubrey's hands than Thomas's, and to the extent Aubrey can provide such evidence, he has an obligation to do so or provide a credible explanation for his failure to do so.

111 B.R. at 274. Similarly, *Devers* holds:

While the burden of persuasion rests at all times on the creditor objecting to discharge, it is axiomatic that the debtor cannot prevail if he fails to offer credible evidence after the creditor makes a pri-

---

10. Certain of the assets allegedly not disclosed here were allegedly transferred by the Downeys prebankruptcy. An analysis of a debtors' "intent to hinder, delay or defraud" through transfer under § 727(a)(2) may be probative of the "knowing and fraudulent" false oath under § 727(a)(4)(A). *See,* 6 *Collier on Bankruptcy,* ¶ 727.04[1][a], at 727–39 (15th ed rev.1999). Several factors may be relevant to the question of intent to defraud through

transfer, such as: lack or inadequacy of consideration; the familial or other close relationship between transferor and transferee; retention of use, benefit or possession; financial condition of transferor; secrecy of conveyance; or the pattern, series or course of transactions. *Stanke,* 234 B.R. at 457; *In re Kaiser,* 722 F.2d 1574, 1582 (2nd Cir.1983). *See also, In re Acequia,* 34 F.3d 800, 806 (9th Cir.1994).

ma facie case. *In re Reed*, 700 F.2d 986, 992–93 (5th Cir.1983). A debtor's failure to offer a satisfactory explanation when called on by the court is sufficient ground for denial of discharge under section 727(a)(5).

759 F.2d at 755. The same principle has been applied in other § 727(a)(4)(A) cases. *See, Sears*, 225 B.R. at 274 (citing cases).

### d. Reliance on counsel

 Finally, the defense of a debtor's reliance on advice of counsel may excuse or explain acts which otherwise bear indicia of fraud, assuming that all relevant information is in fact provided the attorney. *In re McLaren*, 236 B.R. 882, 897 (Bankr.D.N.D.1999). However, attorney error does not absolve a debtor, who signs the petition and schedules under penalty of perjury, from the duty to ensure the information is accurate and complete to the best of his knowledge. 236 B.R. at 898.

## DISCUSSION

The Downeys have raised several defenses to the allegations of the complaint, and the Court has considered them carefully. But the same are ultimately unpersuasive, and the Court concludes the Palmers have carried their burden of proof.

### A. Downey LLC

 Whether "Downey LLC" was formed or not has natural and unavoidable consequences. Either there was an interest in the LLC which had to be disclosed, or the funds, accounts, deposits, and transactions "of" the LLC were personal and had to be disclosed. The evidence establishes that this LLC had not been formed, and the Court thus agrees with the Downeys there was no need to disclose its existence or to schedule their ownership interests in it. But by knowing that there was no "Downey LLC," the Downeys necessarily were aware that any assets "held" in the name of Downey LLC were actually personal assets. There was here no disclosure of the LLC bank account or funds therein, which could be nothing other than the funds of the Downeys.[11] The transactions and assets of "Downey LLC" were disclosable transactions and assets of the Downeys.

### B. The brokerage business

The argument is made that the Downeys' new business, characterized as "Downey Transportation Services," arose solely after bankruptcy. This contention must be viewed in context with all other disclosures and non-disclosures, and the Debtors' conduct.

 On the evening of the date of filing, the Downeys knew that they had and were going to use the ICC authority, returned by the Zarownys a day or two before, and continue in the brokerage business. They knew as of that date that they were not "unemployed" and, within hours of filing, that Schedules I and J were materially false. They utilized the ICC authority in conjunction with their experience, and their knowledge of Loftin Agencies' customers, in order to generate income.[12] The Trustee and creditors were led to believe that the Debtors were unemployed and had no income. They were also led to believe that there was no value to the brokerage business. These are all material and significant matters.

The Court is asked to accept the assertions made in the schedules and statement of affairs as accurate (or, if inaccurate, as made in good faith) because it was only on the way home from their lawyer's office that the Debtors awoke to the need to

---

11. The Downeys also argue that the money in some or all of the undisclosed accounts was believed "seized" by creditors, and/or that the amounts were de minimis. Neither is an excuse for non-disclosure.

12. They did not, however, "use" the bond. Mr. Downey's testimony was to the effect that the new business "ran bare," i.e., without bond, until a new Downey Transportation Services' bond was obtained in the spring of 1998.

generate some sort of income; that they just happened to benefit from the timing of the Zarownys' discovery that they no longer wanted to stay in the business; and that the authority was returned and could again be used. Thus, they allege, at the break of day on February 5—the day after filing bankruptcy—a new business legitimately arose, and Mr. Downey commenced contacting customers (which to a significant, but allegedly only coincidental, degree are the same as Loftin Agencies' customers.) And because this arose in the hours immediately following the filing, the Debtors argue that they had no duty of disclosure. The position taken is simply is not credible.

The problems with this defense go beyond simply a lack of disclosure of an interest in "Downey Transportation Services." For example, the lease of the ICC authority to Denominator is problematic. Not only was there a transfer to family members in a marginally documented transaction, the basis for valuing the lease of the authority for an indefinite term at $595 is unexplained. Less than a month later, the Downeys state in their schedule that the authority itself is worth only $300, an amount half what the Zarownys paid to lease it.

■ The Downeys also failed to disclose their interest in a $10,000 surety bond.[13] The Court concludes that the Palmers' contention that this bond could be redeemed or, at the least, had a refundable premium, was not proven. But the surety bond did have an inherent value to the Downeys, as it was necessary for operation of the pre-bankruptcy brokerage business.[14] The disclosure of this asset would be material to an understanding of the Debtors' financial circumstances and business operations, even in the absence of

a premium refund or other liquidation value.

■ The Downeys also argue that the undisclosed bond would be discovered upon reasonable inquiry by the trustee or creditors. This confuses the likelihood of discovery with the Debtors' duty to disclose. The former is not the relevant test.

## C. The retirement accounts

The Downeys admittedly failed to disclose $47,500 in retirement account holdings with Northwest Mutual Life. This was an omission quickly spotted by, among others, their former accountant. The Downeys claim that the omission was unintentional and their attorney claims it was his secretary's error in transcribing the Debtors' worksheet on which the interest was disclosed. When specifically questioned at the § 341 meeting about the omission, the Debtors admitted their interest in the retirement accounts, and soon after that meeting amended their schedules.

■ However, given the state of the Debtors' financial affairs, the existence of over $40,000 in assets is no small thing. Schedule B (11) by its terms requires disclosure of all interests in retirement accounts, IRS's, pensions and 401(k) accounts. The Downeys signed schedules clearly stating, in that regard, that they had no such assets. Reliance on counsel cannot overcome a patent and obvious nondisclosure.

■ The Debtors further argue that since the retirement assets are fully exempt under Idaho Code § 11–604A, to the extent they are property of the estate at all in light of *Patterson v. Shumate*, 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992), the omission couldn't be "material" since the value could not be accessed by

---

13. There was no evidence that the bond was issued or held in other than personal name.

14. The Downeys argue in briefing that the bond had no value because it was "non-trans-

ferable" and "non-assignable." Yet the Downeys "let" the Zarownys use this bond in conjunction with the "lease" of the authority.

creditors. But materiality does not depend solely on the value of the undisclosed asset or whether that value is reachable by creditors. Materiality instead goes to the impact of disclosure on the full and candid explanation of the Debtors' financial situation, not whether a net value will be distributed to creditors. Accepting the argument the Debtors advance would write schedule B(11) out of existence. Debtors would never have to disclose their retirement assets because if they were property of the estate, they would be exempt. But trustees and creditors are entitled to know what these assets are, if for no other reason than to be able to test the assertion that they are properly held and qualified, and indeed fall within *Patterson* or the state exemption statutes.

Finally, it must be observed that this is not a case where the sole issue is the nondisclosure of retirement accounts. This is but one omission among many, all of which collectively paint an inaccurate picture of the Debtors' finances and conduct. The Debtors' treatment of their retirement accounts does not occur in a vacuum.

### D. The B & M assets

█ There was no disclosure on the statement of affairs, in response to question no. 14, of any property in the Debtors' possession at bankruptcy which belonged to third parties (i.e., assets of B & M Trucking, Inc. or Loftin Agencies, Inc.) which were in the Downeys' possession. Even if de minimis in value and/or held only a short time, the Downeys were obligated to disclose their possession of the assets of their closely held corporations. This is true even if Mountain West Bank could or would soon foreclose on them. Existence and possession of these assets would be material to a complete understanding of the Debtors' finances and several business interests. And, of course, even if the Downeys believed that creditors, such as Mountain State Bank, or transferees, such as Denominator, had par-

amount claim, the Trustee would be entitled to all relevant information in order to test that belief.

### E. The value of Loftin Agencies

Loftin Agencies was active as of December 31, 1997. On that date, there was value to that corporation, on both a book and tax basis. Mr. Richardson's analysis was competent, and the Downeys' attempted impeachment of his methodology and conclusions was unpersuasive.

The Debtors would have the Court believe Loftin Agencies was valueless by the end of 1997, shut down within three weeks, and that their ownership of its stock was a worthless asset as of filing. No reasonable and ultimately credible explanation for this conclusion was supplied. The assertion that Loftin Agencies was valueless is not only impeached by the testimony of the two accountants and by the corporate books and records, it is further belied by the sale of the accounts, the continued servicing of the undisclosed Herbert Loftin debt, the use of Loftin funds to pay personal taxes, the Downeys' immediate post-petition continuation of the brokerage business as a means of making a living, their use of the ICC authority, the conversion of the authority from "dba Loftin Agencies" to "dba Downey Transportation Services", and the similarity of the customer lists used by Loftin Agencies and by the Downeys commencing February 5.

█ The Downeys argue, in part, that they truly (even if erroneously) thought Loftin Agencies had no value. This "good faith" belief, they contend, is sufficient to overcome the inference of fraudulent intent. But here the weight of objective facts shows that Loftin Agencies had value as of the date of the bankruptcy. The Downeys' conduct manifests a belief in that value. The Court finds that the Downeys couldn't have reasonably believed the corporation was valueless.

### F. Debt to Herbert Loftin

The Debtors did not disclose their obligation to Herbert Loftin, the individual who sold the authority and brokerage business to them in the first place. Nor did they disclose that the debt continued to be serviced. The Downeys claim this was due to their counsel's advice that, because they were going to keep paying this debt, it need not be listed. If this advice was given, it was incorrect as a matter of law. Additionally, the Debtors' schedule D listed other secured debts (on their residence and certain vehicles) which the Debtors also intended to pay according to schedule J and their § 521 statement of intent. Thus their alleged reasoning for omitting Herbert Loftin was not consistently applied.[15]

### CONCLUSION

The Debtors signed their statements and schedules under penalty of perjury. They are required to know what is in those documents, and they verify the accuracy of the same. The entire bankruptcy process is keyed by that initial disclosure. It must be full, complete, candid and truthful. The disclosures and statements in this case were not. These omissions and errors were, at the very least, recklessly made as to their truth, and in knowing or reckless disregard of the Debtors' obligation of full and accurate disclosure.

Transfer of assets, including the sale of the accounts and the lease of the ICC authority for a period of 3 weeks, both to family members, both in undocumented or inadequately documented transfers, for consideration not proven to be adequate, and the re-transfer back on the eve of filing so as to allow continued business by the Debtors the next morning, together with the pattern of nondisclosure or incomplete disclosure in the bankruptcy, provide support for a finding that the omissions were intentionally, knowingly and fraudulently made.

Under the totality of the circumstances, the Court finds sufficient evidence of knowledge and fraudulent intent.

The Court further concludes that, particularly when viewed under the totality of circumstances, the nondisclosures were material. While there is here no single undisclosed asset with a substantial, immediately realizable value for creditors, there need not be one in order to find that the duties of complete and honest disclosure imposed on the Debtors by the Code have been violated. Debtors cannot conceal their true financial affairs, and dare their creditors or their trustee to ferret out the truth.

### ORDER

The Court finds that the Plaintiffs have, by a preponderance of the evidence, established the fact of the Debtors' false oath and account in their schedules and statements, that the same were knowing and fraudulent, and that discharge of Michael and Barbara Downey should be denied pursuant to § 727(a)(4)(A). Counsel for the Plaintiffs shall prepare a judgment accordingly for review and entry by the Court.

---

**15.** The ongoing payment of Mr. Loftin relates as well to the Debtors' problematic valuation of the corporation. Servicing the debt is inconsistent with the contention that the business was shut down and closed, as well as with the assertion that it was valueless.