In re Tony Buddy ROLLAND and Pamela Diane Rolland, Debtors.

No. RS 03–15510 PC.

United States Bankruptcy Court, C.D. California, Riverside Division.

Nov. 2, 2004.

Robert E. Huttenhoff, Marshack, Shulman, Hodges & Bastian, LLP, Foothill Ranch, CA, Harry M. Barth, Barth, Berus & Trella, LLP, Orange, CA, for Debtor.

Steven M. Lawrence, Sunny K. Hur, Alvarado, Smith & Sanchez, Santa Ana, CA, for Steven M. Speier, Chapter 7 Trustee.

### MEMORANDUM DECISION

PETER H. CARROLL, Bankruptcy Judge.

Debtors, Tony Buddy Rolland and Pamela Diane Rolland amended Schedule C to increase their homestead exemption from $75,000 to $125,000 on the eve of a sale of their residence by the trustee. Steven M. Speier, Chapter 7 Trustee ("Speier") filed an objection to the Debtors' amendment asserting that the Debtors did not qualify for the increased homestead exemption. Speier further asserted that the amendment was filed in bad faith and is prejudicial to creditors. At the hearing, Steven M. Lawrence and Sunny K. Hur appeared for Speier, and Robert E. Huttenhoff appeared for the Debtors. The court, having considered the pleadings, evidentiary record,[1] and arguments of counsel, makes the following findings of fact

---

1. Speier's evidentiary objections to Debtors' Amendment to Schedule C are overruled.

and conclusions of law[2] pursuant to Fed. R.Civ.P. 52, as incorporated into Fed. R. Bankr.P. 7052 which is applicable to contested matters.

## I. STATEMENT OF FACTS

Prior to bankruptcy, Debtors operated several Burger King and Del Taco franchises in the Inland Empire. On April 10, 2003, Debtors filed their voluntary petition under chapter 7 of the Bankruptcy Code[3] to liquidate their assets and to discharge mounting business and personal debt.[4] Speier was appointed as trustee. In their schedules, Debtors disclosed ownership of a single family residence located at 23350 Modoc Court, Perris, California ("Perris Property"). Debtors valued the Perris Property at $512,000 in Schedule A, and disclosed in Schedule D that the property was subject to a first deed of trust lien in favor of Countrywide Home Loans securing a $401,433 debt and a second deed of trust lien held by HomeEq securing a debt of $98,754.[5] Debtors listed the Perris Property in Schedule C claiming a value of $11,813 as exempt pursuant to California Code of Civil Procedure section 704.730(a)(2).[6]

On May 12, 2003, Debtors appeared at a meeting of creditors conducted pursuant to section 341(a).[7] Speier examined the Debtors at the initial creditors' meeting,[8]

---

2. To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent that any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.

3. Unless otherwise indicated, chapter, section and code references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 (2004), and rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036.

4. In Schedule D, Debtors identified 23 creditors holding claims totaling $2,478,786 secured by real and personal property of the estate. Debtors scheduled $84,658 in unsecured priority debt in Schedule E, consisting of unpaid wages to 79 employees totaling $46,045 and federal, state and local taxes of $38,613. In Schedule F, Debtors listed 226 creditors holding unsecured non-priority claims of $1,106,894, which included credit card debt in excess of $335,262.

5. Debtors' Schedule B further disclosed personal property owned at the time of bankruptcy valued at $323,361, including (a) 2000 Jaguar; (b) 2002 Chevrolet Corvette; (c) 2000 Chevrolet Corvette; (d) 2002 Chevrolet 3500 Truck; (e) 2000 Chevrolet Impala; (f) 2000 Oldsmobile Intrigue; (g) 1999 Chevrolet 1500 Truck; (h) 1994 Hilo RV Trailer; (i) 1995 Logan 2 Horse Trailer; (j) 1999 Yard Carson Trailer; (k) 1999 Sundowner 3 Trailer; (*l*) retirement accounts; (m) a diamond ring and Rolex watch; (n) firearms; (*o*) a horse; and (p) tack, saddles, and other equestrian equipment.

6. Section 704.730(a)(2) of the California Code of Civil Procedure authorizes a homestead exemption in the amount of $75,000 "if the judgment debtor or spouse of the judgment debtor who resides in the homestead is at the time of the attempted sale of the homestead a member of a family unit, and there is at least one member of the family unit who owns no interest in the homestead or whose only interest in the homestead is a community property interest with the judgment debtor." Cal. Civ. Proc. § 704.730(a)(2)(Deering 2004).

7. The Code requires debtors to appear and submit to examination under oath at a meeting of creditors. 11 U.S.C. § 343; Fed. R. Bankr.P.2003. The examination focuses on the debtor's acts, conduct, property, liabilities and financial condition, as well as any matter which might affect the administration of the bankruptcy estate and the debtor's right to a discharge. Fed. R. Bankr.P.2004(b).

8. Shortly thereafter, Debtors filed an amendment to add $139,422 in unsecured non-priority debt to Schedule F. Debtors also filed an Amended Statement of Financial Affairs which substantially altered the sworn responses contained in their original Statement of Financial Affairs filed on April 17, 2003.

and then continued the meeting several times to investigate the validity of the Debtors' claimed exemptions and to obtain further documentation from the Debtors concerning their assets, liabilities and financial condition.[9]

On September 2, 2003, Speier sought to employ Richard A. Halderman, Jr. ("Halderman"), a licensed independent realtor and broker, pursuant to section 327(a) [10] to sell the Perris Property for the sum of $825,000. Debtors objected to the necessity of Halderman's employment, asserting that the Perris Property was worth not more than $592,000 and that there would be no equity remaining for the estate upon a sale of the property after payment of existing encumbrances, costs of sale, and the Debtors' exemption. Debtors amended their Schedule C on October 20, 2003, to claim a $75,000 exemption in the Perris Property pursuant to California Code of Civil Procedure section 704.730(a)(2), and moved to compel Speier to abandon the estate's interest in the Perris Property under section 554(b),[11] alleging that the asset was of inconsequential value and benefit to the estate.[12]

---

9. In conjunction with the investigation, Speier obtained a stipulation from the Debtors pursuant to Fed. R. Bankr.P. 4004(b) extending the deadline to object to the Debtors' discharge from July 11, 2003 to and including August 31, 2003. Speier ultimately continued the meeting of creditors nine times before it was finally concluded on November 17, 2003. The meetings were continued either at the request of Debtors' counsel or due to the Debtors' failure to appear.

10. Section 327(a) authorizes a trustee, with the court's approval, to "employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties" under the Code. 11 U.S.C. § 327(a).

11. Section 554(b) states that "[o]n request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(b); Fed. R. Bankr.P. 6007. Neither the Code nor the Rules specify the time in which a trustee must act to abandon. A trustee's decision whether to abandon property is tied directly to the trustee's duty under section 704(1) "to collect and reduce to money the property of the estate" and to "close [the] estate as expeditiously as is compatible with the best interests of parties in interest." 11 U.S.C. § 704(1). In the Ninth Circuit, an order compelling abandonment is the exception rather than the rule. See Vu v. Kendall

*(In re Viet Vu)*, 245 B.R. 644, 647 (9th Cir. BAP 2000), *quoting Morgan v. K.C. Mach. & Tool Co. (In re K.C. Mach. & Tool Co.)*, 816 F.2d 238, 246 (6th Cir.1987) (stating that "[a]bsent an attempt by the trustee to churn property worthless to the estate ... abandonment should rarely be ordered"). Because post-petition appreciation in the value of estate property accrues to the benefit of the estate, a motion to compel an abandonment may be an appropriate remedy for debtors who believe they are being prejudiced by a trustee's undue delay in administering estate assets. *See Hyman v. Plotkin (In re Hyman)*, 967 F.2d 1316, 1321 n. 11 (9th Cir.1992).

12. Debtors' motion to compel an abandonment was based on reports concerning the value of the Perris Property obtained from the following licensed appraisers: (a) Uniform Residential Appraisal Report by Daniel J. Marshall, Marshall's Appraisal Service/Professional Real Estate Appraisers stating that the value of the Perris Property as of September 9, 2003, was $553,000 based upon the sales comparison approach and a marketing time of 30–90 days; (b) Uniform Residential Appraisal Report by Glenn Pierce stating that the value of the Perris Property as of September 17, 2003, was $570,000 based upon the sales comparison approach and a marketing time of 3–6 months; and (c) Uniform Residential Appraisal Report by Carol J. Dyar stating that the value of the Perris Property as of September 9, 2003, was $592,000 based upon the sales comparison approach and a marketing time of 3 months. Debtors argued that the Perris Property had no equity based on the following analysis:

At a hearing on November 10, 2003, the court overruled the Debtors' objection to Speier's application to employ Halderman and denied, in part, the Debtors' motion to compel abandonment of the Perris Property. On November 26, 2003, the court entered an order on Debtors' motion to compel abandonment which granted Speier "through and including April 30, 2004, to market and sell the [Perris] Property for the benefit of the estate" and provided that "[a]bsent further order of the Court, the Property shall be deemed abandoned on May 1, 2004 for all purposes under 11 U.S.C. § 554...."[13] A separate order authorizing Speier to employ Halderman as a realtor to sell the Perris Property was entered on November 26, 2003.

On March 24, 2004, Speier filed a motion seeking an extension of the April 30th deadline to sell the Perris Property for cause, alleging that the Debtors had engaged in a pattern of conduct calculated to frustrate his efforts to market and sell the property for the estate. Specifically, Speier alleged, in pertinent part, that:

2. The Debtors have placed a 17–page Uniform Residential Appraisal Report prepared by one "Daniel J. Marshall, CRA" in the front door area of the Property, listing the fair market value of the Property as of September 9, 2003, at $553,000.00....

3. The Debtors have placed a 16–page appraisal prepared by one "Glenn Pierce" in the front door area of the

| | |
|---|---|
| Fair Market Value | $592.000.00 |
| Cost of Sale (8%) | $ 74,360.00 |
| Countrywide Home Loans | $401,433.09 |
| HomeEq | $ 98,754.00 |
| *Exemption* | $ 75,000.00 |
| Subtotal | $622,547.09 |
| Net Equity to Estate | $ 0 |

Debtors reasoned that, even assuming a value as high as $592,000, there would be no equity

Property, listing the fair market value of the Property as of September 17, 2003, at $570,000.00....

4. The Debtors have placed a 2–page document entitled "* * *DISCLOSURES* * *" (which is centered on the top of the document and typed in what appears to be in 26 inch font) in the front door area of the Property, which lists thirty-five (35) line item entries with regard to problems related to the Property....

5. The Debtors have placed a 1–page copy of an article from the local newspaper, *The Press–Enterprise.* The article, which contains the handwritten date in the top right corner of "10–1–03", is entitled "Perris worries about ex-cons"....

6. On two (2) separate occasions, the first time on February 21, 2004 and the second time on March 3, 2004, the RICHARD A. HALDERMAN, JR. visited the Property to show it to potential buyers and found that his sign marketing the Property, which had been hammered into the lawn, was pulled out and laid face down on the lawn. The Realtor also identified that his brochures had been pulled out from the clear acrylic brochure box on the sign.

7. On several occasions, RICHARD A. HALDERMAN, JR. has been to the Property and has found the Property in a disorderly state, including,

for the estate and that to administer the property "would be a waste of resources, including professional fees." Motion to Compel Abandonment of Real Property, p. 3, l. 11–13 (emphasis added).

13. Order Denying, In Part, and Granting, in Part, Debtors' Motion to Compel Abandonment of Real Property entered on November 26, 2003.

but not limited to, boxes piled up in the living room and dining room, unmade beds, piles of clothes in each of the bedrooms, dirty pastures and dirty pool and spa.[14]

Speier sought an extension of the deadline to sell the Perris Property to August 31, 2004, permission to place a lock-box on the property, and an order compelling the Debtors to cooperate with Speier and Halderman in the sale of the property. In response, Debtors objected to an extension of the April 30th deadline, denied interfering with Speier's efforts to sell the property, and argued that the property had not sold simply because it was not worth the trustee's asking price of $825,000. At a hearing on April 12, 2004, the court granted Speier's motion, extended the deadline to sell the Perris Property to July 31, 2004, and ordered that the property would be deemed abandoned on August 1, 2004, for all purposes under section 554 absent further order of the court. The court further ordered the Debtors to cooperate fully with Speier and Halderman in their efforts to sell the Perris Property, and to refrain from conduct, such as posting appraisals and crime statistics, calculated to obstruct the sale process.[15]

Less than two months later, Speier received an offer from a qualified buyer to purchase the Perris Property for $755,000 cash. On June 16, 2004, Speier filed a motion seeking authority to sell the Perris Property for the sum of $755,000 cash, subject to overbids, pursuant to sections 363(b) & (f). Debtors immediately responded with a second amendment to Schedule C filed on June 21, 2004, increasing their claim of exemption in the Perris Property from $75,000 to $125,000 pursuant to California Code of Civil Procedure section 704.730(a)(3)(B).[16] Eight days later, Debtors objected to the proposed sale of the Perris Property on the grounds that Speier's motion did not recite that a distribution would be made on account of the Debtors' newly-amended homestead exemption. In their objection, Debtors dismiss any question regarding the timing of their amendment, stating:

> Mr. and Mrs. Rolland initially listed a homestead exemption in the amount of $75,000. No objection was filed. Recently, the Rollands amended their

---

14. Motion to Modify Order Denying, in Part, and Granting, in Part, Debtors' Motion to Compel Abandonment of Real Property [23350 Modoc Court, Perris, California] to Extend the Time for the Trustee to Sell the Property to August 31, 2004 and for the Installation of a Lock–Box at the Property, p. 5, l. 4 to p. 6, l. 12.

15. An Order Granting Trustee's Motion to Modify Order Denying, in Part, and Granting, in Part, Debtors' Motion to Compel Abandonment of Real Property [23350 Modoc Court, Perris, California] to Extend the Time for the Trustee to Sell the Property, was entered on July 13, 2004.

16. Section 704.730(a)(3) of the California Code of Civil Procedure authorizes a homestead exemption of $125,000 "if the judgment debtor or spouse of the judgment debtor who resides in the homestead is at the time of the

attempted sale of the homestead any one of the following:

(A) A person 65 years of age or older.
(B) A person physically or mentally disabled and as a result of that disability is unable to engage in substantial gainful employment. There is a rebuttable presumption affecting the burden of proof that a person receiving disability insurance benefit payments under Title II or supplemental security income payments under Title XVI of the federal Social Security Act satisfies the requirements of this paragraph as to his or her inability to engage in substantial gainful employment."

Cal. Civ. Proc. § 704.730(a)(3). On July 14, 2003, the homestead exemption afforded under California Code of Civil Procedure section 704.730(a)(3) was increased from $125,000 to $150,000, effective January 1, 2004. *See* 2003 Cal. Adv. Legis. Serv. 64 (Deering).

homestead exemption to $125,000 *after they learned that they were eligible for this exemption due to Mrs. Rolland's pre-existing mental disability.* After discussing these issues with Mrs. Rolland's medical professionals, the Rollands determined that it would be in their family's best interest to amend the exemption and seek their full rights under state law.[17]

Debtors sought payment of the entire $125,000 claimed exemption out of escrow. On July 20, 2004, Speier filed a timely objection to the Debtors' second amended claim of exemption, alleging that the Debtors did not qualify for a $125,000 exemption under California Code of Civil Procedure section 704.730(a)(3)(B). Speier further alleged that Debtors' amendment to Schedule C was filed in bad faith and was prejudicial to creditors.

On July 22, 2004, the court entered an order authorizing the sale of the Perris Property for the sum of $755,000. In its order, the court directed Speier to distribute $75,000 to the Debtors on account of their claimed homestead exemption of $125,000, and to deposit the remaining $102,990 net sale proceeds in a separate interest-bearing account pending resolution of Speier's objection to the remaining $50,000 claimed by the Debtors as exempt. The hearing on Speier's objection, originally set for August 16, 2004, was continued to October 7, 2004, to allow the parties an opportunity to conduct limited discovery. After oral argument at the continued hearing on October 7, 2004, the matter was taken under submission.

## II. DISCUSSION

This court has jurisdiction over this contested matter pursuant to 28 U.S.C. sections 157(b) and 1334(b). This matter is a core proceeding under 28 U.S.C. section 157(b)(2)(A), (B) and (O). Venue is appropriate in this court. 28 U.S.C. § 1409(a).

### A. Debtors' Right to Exemptions

■ Upon the filing of a bankruptcy petition, all property in which the debtor possesses a legal or equitable interest at the commencement of the case becomes property of the bankruptcy estate. 11 U.S.C. § 541(a)(1). A debtor may remove property from the bankruptcy estate by claiming exemptions. *Bronner v. Gill (In re Bronner)*, 135 B.R. 645, 647 (9th Cir. BAP 1992); *Galvan v. Galvan (In re Galvan)*, 110 B.R. 446, 449 (9th Cir. BAP 1990).

■ Section 522(b)(1) of the Code permits a debtor to choose between exempting either the property specified in section 522(d) or the property protected by federal nonbankruptcy law or state law, "unless the State law that is applicable to the debtor ... specifically does not so authorize...." 11 U.S.C. § 522(b)(1). California has chosen to "opt out" of the federal exemption scheme, so California residents filing for bankruptcy are limited to the exemptions afforded under state law. *See, e.g., Wolf v. Salven (In re Wolf)*, 248 B.R. 365, 367 (9th Cir. BAP 2000) (stating that a debtor in California "may exempt any property that is exempt under state law in effect on the petition date"); *In re Rostler*, 169 B.R. 408, 411 (Bankr.C.D.Cal.1994) (stating that "California has established its own exemption system contained in C.C.P. §§ 704.010 et seq.").

■ Exemptions serve to protect and foster a debtor's fresh start from bank-

---

**17.** Opposition to Trustee's Motion for Authority to Sell Real Property of the Debtor Other than in the Ordinary Course of Business Free and Clear of Liens and Encumbrances, Approval of Overbid Procedures, and Approval of Realtors Commissions, p. 2, l. 10–17 (emphasis added).

ruptcy. *See In re Hice,* 223 B.R. 155, 157 (Bankr.N.D.Ill.1998); *Bernstein v. Pavich (In re Pavich),* 191 B.R. 838, 846 (Bankr. E.D.Cal.1996). Exemption rights are fixed on the date of the petition. *Wolf,* 248 B.R. at 367; *Harris v. Herman (In re Herman),* 120 B.R. 127, 130 (9th Cir. BAP 1990). Under the Code and California law, exemptions are to be construed broadly and liberally in favor of the debtor. *In re Arrol,* 207 B.R. 662, 665 (Bankr.N.D.Cal. 1997). Homestead exemptions, in particular, " 'are to be construed liberally on behalf of the homesteader.' " *Id.* at 665, *quoting Ingebretsen v. McNamer,* 137 Cal. App.3d 957, 187 Cal.Rptr. 529, 530 (1982).

 To claim an exemption, a debtor must file a list of the property claimed as exempt under section 522(b). 11 U.S.C. § 522(*l*); Fed. R. Bankr.P. 4003(a). Once a debtor claims property as exempt, any party in interest may object to the claimed exemption.[18] The objecting party has the burden of proving that the exemption is not properly claimed. Fed. R. Bankr.P. 4003(c). Absent a timely objection, property claimed as exempt by the debtor is exempt. 11 U.S.C. § 522(*l*). *Taylor v. Freeland & Kronz,* 503 U.S. 638, 643–44, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992); *Hyman,* 967 F.2d at 1319 n. 6. Property remaining in the estate after allowance of the debtor's exemptions is subject to administration by the trustee for the benefit of creditors.

B. *Debtor's Duty to File Schedules and Statements*

Section 521(1) of the Code requires the debtor to file "a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial affairs." 11 U.S.C. § 521(1). Section 521(3) further requires a debtor to "cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties" under the Code. 11 U.S.C. § 521(3).

 Debtors have an absolute duty to file complete and accurate schedules. *See Cusano v. Klein,* 264 F.3d 936, 946 (9th Cir.2001); *In re Mohring,* 142 B.R. 389, 394 (Bankr.E.D.Cal.1992), *aff'd,* 153 B.R. 601 (9th Cir. BAP 1993), *aff'd,* 24 F.3d 247 (9th Cir.1994). Full and comprehensive disclosure is critical to the integrity of the bankruptcy process. *See, e.g., Heidkamp v. Whitehead (In re Whitehead),* 278 B.R. 589, 594 (Bankr.M.D.Fla. 2002) (stating that "[t]he veracity of the debtor's Statement is absolutely essential to the successful administration of the Bankruptcy Code"); *In re Bohrer,* 266 B.R. 200, 201 (Bankr.N.D.Cal.2001) (opining that "[a] debtor may not adopt a cavalier attitude toward ... the accuracy of his schedules by arguing that they are not precise and correct"); *McElroy v. McElroy (In re McElroy),* 229 B.R. 483, 488 (Bankr.M.D.Fla.1998) (noting that "[a] debtor's complete disclosure is essential to the proper administration of the bankruptcy estate"); *In re Carter,* 205 B.R. 733, 736 (Bankr.E.D.Penn.1996) (observing that "[h]onesty and full disclosure are the most basic hallmarks of good faith"); *Holder v. Bennett (In re Bennett),* 126 B.R. 869, 875 (Bankr.N.D.Tex.1991) (stating that "[c]andor, accuracy and integrity are required of a debtor in bankruptcy"). "The proper 'operation of the bankruptcy system depends on honest reporting.' " *Mohring,* 142 B.R. at 389, *quoting Payne v. Wood,* 775 F.2d 202, 205 (7th Cir.1985). *See Carlucci & Legum v. Murray (In re Murray),*

---

**18.** An objection to a claimed exemption must be filed within 30 days after the conclusion of the meeting of creditors held under section 341(a) or within 30 days after any amendment to the schedule of property claimed as exempt. Fed. R. Bankr.P. 4003(b).

249 B.R. 223, 231 (E.D.N.Y.2000) (stating that "[p]roperty is not exempt by fiat of the debtor, but only through a process of compliance with the [Code's disclosure requirements]").

Schedules and statements are signed under penalty of perjury. Fed. R. Bankr.P. 1008. Debtors are presumed to have read the schedules and statements before signing the documents, and are responsible for their contents. *Carpenter v. Fanaras (In re Fanaras),* 263 B.R. 655, 667 (Bankr.D.Mass.2001). Whether or not the documents are prepared by an attorney, debtors bear an independent responsibility for the accuracy of the information contained in their schedules and statements. *See, e.g., AT&T Universal Card Servs. Corp. v. Duplante (In re Duplante),* 215 B.R. 444, 447 n. 8 (9th Cir. BAP 1997) (noting that "[s]chedules and statements of financial affairs are sworn statements, signed by debtors under penalty of perjury" and warning that "[a]dopting a cavalier attitude toward the accuracy of the schedules and expecting the court and creditors to ferret out the truth is not acceptable conduct by debtors or their counsel"); *In re Pettey,* 288 B.R. 14, 21 (Bankr.D.Mass. 2003) (stating that the "[d]ebtor bore an independent responsibility for the accuracy of his schedules and matrix"); *Palmer v. Downey (In re Downey),* 242 B.R. 5, 15 (Bankr.D.Idaho 1999) (stating that "attorney error does not absolve a debtor, who signs the petition and schedules under penalty of perjury, from the duty to ensure the information is accurate and complete to the best of his knowledge"). The trustee and parties in interest should be able to determine whether an exemption claim is valid simply by reading the debtor's schedules. *Hyman,* 967 F.2d at 1319–20 n. 6; *Mohring,* 142 B.R. at 395. Schedules and statements which are inaccurate or incomplete must be corrected by the debtor, and any ambiguities contained therein are construed against the debtor. *Mohring,* 142 B.R. at 394–95; *see Hyman,* 967 F.2d at 1319 n. 6 (stating that "[g]iven that the debtor controls the schedules, we construe any ambiguity therein against him").

### C. *Amendment of Schedules and Statements*

Errors and omissions in a debtor's schedules and statements may be corrected by amendment. Debtors have the right to amend their petition, lists, schedules or statement of affairs *as a matter of course* at any time until the case is closed. Fed. R. Bankr.P. 1009(a) (emphasis added). Amendments under Rule 1009(a) are not only liberally allowed, but no court approval is required. *Martinson v. Michael (In re Michael),* 163 F.3d 526, 529 (9th Cir.1998); *In re Bowden,* 254 B.R. 907, 909 (Bankr.D.Idaho 2000).

Exemptions can be amended at any time during the pendency of a bankruptcy case. *Andermahr v. Barrus,* 30 B.R. 532, 534 (9th Cir. BAP 1983). Indeed, bankruptcy courts have no discretion to deny the amendment of exemptions unless the amendment is proposed in bad faith or would prejudice creditors. *Arnold v. Gill (In re Arnold),* 252 B.R. 778, 784 (9th Cir. BAP 2000); *see Magallanes v. Williams (In re Magallanes),* 96 B.R. 253, 256 (9th Cir. BAP 1988) (stating that "[a]mendments are and should be liberally allowed at any time absent a showing of bad faith or prejudice to third parties" and that such a standard augments a debtor's "fresh start").

### D. *Debtors' Amendment to Schedule C is Proposed in Bad Faith*

Bad faith is determined by an examination of the "totality of circumstances." *Kaelin v. Bassett (In re Kaelin),* 308 F.3d 885, 889 (8th Cir.2002). *See,*

e.g., *In re Colvin*, 288 B.R. 477, 481 (Bankr.E.D.Mich.2003) (stating that "[i]n the context of an amendment of exemptions, bad faith is determined by an examination of the totality of circumstances"); *In re Sumerell*, 194 B.R. 818, 832 (Bankr. E.D.Tenn.1996) (opining that a finding of bad faith based upon a consideration of the totality of circumstances is required to justify denial of original or amended claims of exemption). Upon a showing of bad faith,[19] the bankruptcy court may prevent debtors from amending their claimed exemptions in Schedule C. *See Kaelin*, 308 F.3d at 889; *Michael*, 163 F.3d at 529; *Arnold*, 252 B.R. at 784.

■■■■■ Delay in claiming an exemption, of and by itself, does not constitute bad faith. *Arnold*, 252 B.R. at 785. Concealment of assets is the usual ground for a finding of "bad faith." *Arnold*, 252 B.R. at 785; *see In re Hoffpauir*, 258 B.R. 447, 452 (Bankr.D.Idaho 2001) (observing that "[b]ad faith must be evaluated on the entirety of the evidence, and generally involves consideration of whether debtors have attempted to conceal assets"). Intentional concealment can be inferred from the facts and circumstances of a case, including non-disclosure resulting from a debtor's reckless disregard for the truth of information furnished in the schedules and statements. *See, e.g., Jordan v. Bren (In re Bren)*, 303 B.R. 610, 614 (8th Cir. BAP 2004) (stating that "multiple inaccuracies or falsehoods may rise to the level of reckless indifference to the truth, which is the functional equivalent of intent to deceive"); *Colvin*, 288 B.R. at 482 (denying debtor's amended claim of exemption finding that the failure to disclose a $10,000 tax refund "resulted from a cavalier and reckless intention regarding their disclosure obligations"); *Henkel v. Green (In re Green)*, 268 B.R. 628, 648 (Bankr.M.D.Fla.2001) (stating that a debtor's failure to promptly amend schedules to correct errors and omissions made under oath "can be considered reckless indifference to the truth and is tantamount to fraud"). Debtors who, acting with reckless disregard for the accuracy of the information contained in their schedules, fail to disclose substantial value in their home have been denied the right to amend their exemptions for bad faith. *See In re Bauer*, 291 B.R. 127, 130–31 (Bankr.D.Minn.2003), *aff'd, Bauer v.*

---

**19.** Courts are split over the question of whether bad faith or prejudice must be established by a preponderance of the evidence or by clear and convincing evidence. *Compare Matter of Yonikus*, 996 F.2d 866, 872 (7th Cir.1993) (holding that bad faith and/or prejudice must be shown by clear and convincing evidence), *In re Grogan*, 300 B.R. 804, 807 (Bankr.D.Utah 2003) (observing that disallowance of an amendment requires clear and convincing evidence of bad faith and/or prejudice), and *In re Kauffman*, 299 B.R. 641, 644 (Bankr.M.D.Fla.2003) (stating that bad faith and/or prejudice must be established by clear and convincing evidence), *with In re Daniels*, 270 B.R. 417, 422 n. 2 (Bankr.E.D.Mich. 2001) (stating that the applicable standard for objections to amended claims of exemption is preponderance of the evidence), *In re Lusiak*, 247 B.R. 699, 702 (Bankr.N.D.Ohio 2000) (explaining that the objecting party has the burden of proving that a claimed exemption is not proper by a preponderance of the evidence), and *Hunter v. Patton (In re Patton)*, 200 B.R. 172, 175 (Bankr.N.D.Ohio 1996) (observing a preponderance of the evidence is necessary to sustain an exemption objection). The cases holding that the preponderance of the evidence standard applies to contested matters involving objections to exemption claims is consistent with the Supreme Court's decision in *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), which held that preponderance of the evidence was the appropriate standard in determining objections to the dischargeability of debts under section 523(a). In light of the BAP's discussion of this issue in *Arnold*, the court has applied the preponderance of the evidence standard to resolve this contested matter. *Arnold*, 252 B.R. at 784 n. 10.

*Iannacone (In re Bauer)*, 298 B.R. 353, 357 (8th Cir. BAP 2003) (holding that the bankruptcy court did not err in finding bad faith and denying a debtors' amended claim of exemption based upon evidence that the debtors undervalued their home in the schedules to reflect no equity).

■ Bad faith findings can be based on grounds *other* than concealment. In *Arnold*, the Bankruptcy Appellate Panel for the Ninth Circuit stated:

> We do not hold that there can be no grounds for "bad faith" other than the debtor's intent to hide an asset; but no other grounds were presented in this case. For example, the panel recognizes that there could be bad faith if the debtor intentionally stood by while the estate risked the cost of litigating a possible recovery, and only stepped in to claim an exemption after the estate was successful. In such circumstances, the debtor would be shifting the risk of funding the litigation to the estate, and playing a game of "heads I win, tails you lose." As with hiding assets, such intentional behavior may be a good reason to disallow an amendment to Schedule C.

*Arnold*, 252 B.R. at 786. Other courts have held that a debtor's intentional and deliberate delay in amending an exemption for the purpose of gaining an economic or tactical advantage at the expense of creditors and the estate constitutes "bad faith." *In re Kauffman*, 299 B.R. 641, 644 (Bankr. M.D.Fla.2003); *In re Talmo*, 185 B.R. 637, 646 (Bankr.S.D.Fla.1995).

■ In this case, the timing of the Debtors' increased exemption claim suggests bad faith. From the outset, Debtors adopted a "scorched-earth" strategy aimed at saving their home from liquidation by the trustee. The evidence supports a finding that Debtors undervalued the Perris Property in Schedule A. When Speier's investigation revealed that the Perris Property was worth upwards of $825,000, Debtors objected to Speier's employment of Halderman to market and sell the property and sought an order compelling Speier to abandon the property. Once Speier was given a reasonable period to market the property, Debtors ignored their statutory duty to cooperate with the trustee and engaged in a calculated effort to sabotage Speier's attempts to obtain a buyer. Debtors posted appraisals, a list of defects, and crime statistics on the Perris Property to chill offers from interested buyers. There was evidence that the Debtors also uprooted Halderman's "For Sale" sign on the Perris Property, removed sales information from the premises, and obstructed Halderman's access to the property for viewing by potential buyers. Not until the Debtors were ordered to cease and desist was Speier able to sell the property. Speier then sold the Perris Property for $755,000 cash—an amount that exceeded Debtors' $512,000 valuation by $243,000. Only then did Debtors amend Schedule C to claim a $125,000 homestead exemption, primarily for the purpose of preventing Speier from realizing the equity derived from the sale of the property.

Secondly, Debtors' claim that they just recently discovered the basis for claiming a $125,000 homestead exemption under California Code of Civil Procedure section 704.730(a)(3)(B) is belied by the record. In their opposition, Debtors assert:

> The Rollands' current counsel amended the exemption to $75,000 shortly after it was retained, however, was completely unaware of her medical condition. The Rollands' current counsel later amended the exemption to $125,000 upon learning of her medical condition and inability to sustain em-

ployment.[20]

In fact, the record establishes that Debtors' co-counsel knew or should have known of Pamela Rolland's existing medical problems as early as September 16, 2003. Debtors are currently represented by the Law Offices of Harry M. Barth and the law firm of Marshack Shulman Hodges & Bastian LLP.[21] Debtors' co-counsel, Harry M. Barth, who has represented the Debtors since the commencement of the case, testified by declaration that, at the time of bankruptcy, he "was aware of the fact that Pamela Rolland had an [sic] existing medical problems."[22] On September 16, 2003, Debtors objected to Speier's application to employ Halderman. The objection was prepared and filed by Marshack Shulman Hodges and Bastian LLP, as co-counsel for the Debtors. At the time the objection was filed, Schedule C reflected a claim of exemption in the Perris Property of only $11,813. In objecting to Halderman's employment, Debtors stated an intention to amend Schedule C to increase their homestead exemption to $125,000.[23] Inexplicably, Debtors amended Schedule C to claim a $75,000 exemption rather than an exemption of $125,000, notwithstanding Barth's knowledge of Pamela Rolland's apparent medical condition and Debtors' statement in the Halderman employment objection.

Finally, the record supports a finding that Speier's investigation of Debtors' valuation of the Perris Property in Schedule A and Debtors' right to the exemptions claimed in Schedule C was hampered by incorrect and incomplete disclosures contained in the schedules and statements filed with the court. Some of the more glaring inconsistencies appear in the Debtors' Statement of Financial Affairs. For example:

1. On April 17, 2003, Debtors disclosed in response to Question #1 gross income received from employment, trade, profession, or business operations totaling $200,747, including $7,000 attributable to "Tony Rolland Consulting for Mancha Development" and $4,500 derived from "Pam Rolland Horse Business." On June 3, 2003, Debtors amended their sworn response to Question #1 to state under penalty of perjury that they had received no gross income whatsoever for the period of January 1, 2001 to April 10, 2003. Tony Rolland then contradicted this disclosure in his declaration in opposition to Speier's objection, stating that he was "employed as a Vice President for Panera Foods in St. Louis on the Petition Date."[24]

---

20. Opposition to Chapter 7 Trustee's Objection to Debtors' Amendment to Schedule C, p. 6, l. 25 to p. 7, l. 1.

21. Debtors have been represented by Harry M. Barth, Esq. ("Barth") and Marshack Shulman Hodges & Bastian LLP, as co-counsel, since approximately September 16, 2003. Barth was Debtors' attorney of record upon the filing of the petition. On October 20, 2003, Debtors filed a document entitled "Notice of Association of Counsel" in which Debtors stated that they had associated as co-counsel, along with the Law Offices of Harry M. Barth, the law firm of Marshack Shulman

Hodges & Bastian LLP to represent them in this case.

22. Declaration of Harry M. Barth, p. 1, l. 27–28.

23. Debtors' Opposition to Trustees' Application to Employ Richard A. Halderman, Jr. as Realtor and Request for Hearing, p. 2, l. 6 & n. 1.

24. Declaration of Tony Rolland in support of Opposition to Chapter 7 Trustee's Objection to Debtors' Amendment to Schedule C, p. 10, l. 18–19.

2. On April 17, 2003, Debtors disclosed in response to Question #9 that they had paid the sum of $25,000 to Barth Barth & Trella for debt counseling and bankruptcy in two installments between January 23–30, 2003. Barth disclosed receipt of the $25,000 fee in a statement filed pursuant to Rule 2016(b) of the Federal Rules of Bankruptcy Procedure and a Declaration Re: Limited Scope of Appearance. However, Debtors amended their sworn response to Question #9 on June 3, 2003, to state that no amount whatsoever had been paid to any person prior to filing, including attorneys, for debt counseling or legal services in conjunction with their bankruptcy case.

3. On April 17, 2003, Debtors disclosed in response to Question #18A that they owned an interest in six businesses within a period of six years prior to bankruptcy, including three Burger King franchises and a Del Taco franchise. On June 3, 2003, Debtors amended their sworn answer to Question 18A and stated under penalty of perjury that they did not own an interest in any business within six years preceding the commencement of the case.

4. On April 17, 2003, Debtors stated in response to Question #19A that Pamela Rolland and Patricia Milton–Koury had kept or supervised the keeping of the Debtors' books of account and records from "1996—Present." Debtors further stated in

response to Question #19B that Pamela Rolland and Patricia Milton–Koury had audited the Debtors' books of account and records, or prepared financial statements for the Debtors, for the period of "1996—Present." According to Debtors' response to Question #19C, Pamela Rolland and Patricia Milton–Koury were in possession of the Debtors' books of account and records on the date of the petition. Debtors later amended their sworn responses to Questions #19A, 19B and 19C on June 3, 2003, and affirmatively responded "None" to each of the questions under penalty of perjury. Contradicting this disclosure, Tony Rolland stated in his declaration filed in opposition to Speier's objection that Pamela Rolland "was involved in bookkeeping for the family businesses (Burger King and Del Taco franchises)."[25] Patricia Milton stated in her declaration that she has been preparing tax returns for the Debtors for the past 12 years.[26]

■■■ Based on the totality of circumstances surrounding Debtors' amendment to Schedule C on July 21, 2004, the court finds that the amendment claiming an increased homestead exemption of $125,000 pursuant to California Code of Civil Procedure section 704.730(a)(3)(B) was proposed in bad faith. Therefore, Speier's objection to Debtors' amendment of Schedule C on July 21, 2004, is sustained.[27]

**25.** *Id.*, at p. 9, l. 10–11.

**26.** Declaration of Patricia Milton in support of Sur Reply Chapter 7 Trustee's Objection to Debtors' Amendment to Schedule C, p. 5, l. 5–6.

**27.** Speier also argued that Debtors' amendment of Schedule C should be denied as prejudicial to creditors because "notice of the Amendment was not provided to any creditor in the case." Objection of Chapter 7 Trustee to Debtors' Amendment to Schedule C, p. 4, l. 22–23. However, Rule 1009(a) does not require notice to all creditors of amendments to

E. *Debtors are Not Entitled to A Homestead Exemption Under C.C.P. § 704.730(a)(3)(B)*

Even if Debtors were permitted to amend Schedule C to claim an increased homestead exemption, the evidence supports a finding that the Debtors are not entitled to a $125,000 exemption under California Code of Civil Procedure section 704.730(a)(3)(B). "The mere fact that [debtors] can *claim* the exemption does not necessarily mean that they are *entitled* to it." *Wolfberg,* 255 B.R. at 883; *see Andermahr,* 30 B.R. at 534 (stating that "[t]he right to amend is not the same as the right to the exemption"). To claim an exemption under California Code of Civil Procedure section 704.730(a)(3)(B), a debtor must (a) suffer from a physical or mental disability on the date of bankrupt-

cy, and (b) be unable to engage in substantial gainful employment as a direct result of such physical or mental disability. *Rostler,* 169 B.R. at 411. As the objecting party, Speier had the burden of establishing that Debtors were unable to satisfy one or more elements of California Code of Civil Procedure section 704.730(a)(3)(B). Fed. R. Bankr.P. 4003(c).

1. *Physical or Mental Disability*

With respect to the first requirement, Speier points to the fact that nothing in the Debtors' schedules nor their testimony at the meeting of creditors remotely suggests that Pamela Rolland either suffered from a physical or mental disability or had on-going medical expenses attributable to such a medical con-

---

the petition, schedules or statement of financial affairs. Fed. R. Bankr.P. 1009(a). The rule simply requires the debtor to "give notice of the amendment to the trustee *and to any entity affected thereby." Id.* (emphasis added). Simply put, debtors amending their schedule of exemptions must notify those creditors who have a sufficient stake in the issue that they would be likely to object. *Woodson v. Fireman's Fund Ins. Co. (In re Woodson),* 839 F.2d 610, 615 (9th Cir.1988).

On July 21, 2004, Debtors served notice of their latest amendment to Schedule C on Speier and his counsel, as well as the United States Trustee. Nine months ago, Debtors amended Schedule C to claim a $75,000 homestead exemption in the Perris Property. At that time, Debtors served only Speier and the United States Trustee with notice of the amendment. Despite the fact that notice of the earlier amendment had not been provided to any creditor, Speier did not object that the Debtor's $75,000 claim of exemption should be disallowed as prejudicial to creditors. Moreover, Speier concedes that 21 "interested creditors" were served with a copy of his objection to the Debtors' latest amendment to Schedule C on July 20, 2004. Reply to Opposition to Chapter 7 Trustee's Objection to Debtors' Amendment to Schedule C, p. 5, l.16–17. No creditor or other party in interest either objected to the Debtor's increased exemption nor appeared at the hearings on

Speier's pending objection to allege actual prejudice. Therefore, the fact that Debtors failed to serve all creditors with notice of their amendment to Schedule C on July 20, 2004, is not, of and by itself, sufficient to establish prejudice. *See Arnold,* 252 B.R. at 787 (stating prejudice requires that creditors "suffer an actual economic loss" as a result of the debtor's delay in claiming an exemption). "Prejudice" to the trustee may arise where debtors amend their schedules to claim an exemption in estate property after the trustee, in reliance on the debtors' initial schedules, has engaged in substantial efforts to sell the property to pay allowed claims. *In re Cudeyro,* 213 B.R. 910, 919 (Bankr.E.D.Pa.1997). In such instances, bankruptcy courts may condition allowance of the amended exemption on the payment of trustee's and counsel's fees from assets not otherwise available to the estate. *Latman v. Burdette,* 366 F.3d 774, 786 n. 9 (9th Cir.2004); *Arnold,* 252 B.R. at 789; *Roberts v. Harris (In re Harris),* 101 B.R. 210, 213 (Bankr.E.D.Cal.1989). In this case, Speier did not request such relief in his objection or submit evidence of reasonable fees and costs incurred by Speier and his counsel in conjunction with liquidation of the Perris Property, nor did the Debtors offer to condition allowance of their amended exemption upon the payment of such fees and expenses.

dition at the time of bankruptcy. Debtors' schedules and statements are, in fact, silent as to Pamela Rolland's medical condition on the petition date.[28] However, Dr. Julie Wareham, a graduate of Loma Linda University Medical School and one of the primary physicians at Inland Psychiatric Medical Group, Inc., testified by declaration that she began treating Pamela Rolland for severe depression "on or about October 2000 when she was referred ... after having been admitted to mental hospitals in Cerritos, California and Loma Linda, California."[29] Dr. Wareham diagnosed Pamela Rolland as suffering from severe depression as of the petition date, stating:

> Over the course of my treatment for Mrs. Rolland, it is my medical opinion is that she is mentally disabled and that this condition has been persistent since approximately October 2000.[30]

Dr. Wareham's testimony was bolstered by the opinion of Jan Winters, M.A., M.F.T., a practicing psychotherapist for 18 years, who is also employed at Inland Psychiatric Medical Group, Inc. and is "the primary therapist involved in the treatment of Pamela Rolland."[31] While it is true that Mrs. Rolland's recurring medical expenses are not apparent from the petition nor budgeted in Schedule J, the schedules and statements do not contain any affirmative or binding admissions by the Debtors to the contrary. Speier did not offer any evidence to contradict the opinions of either Dr. Julie Wareham or Jan Winters concerning Pamela Rolland's medical con-

dition at the time of bankruptcy. Based on the evidence presented, Speier failed to show that Pamela Rolland was not suffering from a physical or mental disability as of the date of bankruptcy.

### 2. *Substantial Gainful Employment*

With respect to the second requirement of California Code of Civil Procedure section 704.730(a)(3)(B), Speier was required to establish, as of the petition date, that Pamela Rolland was able to engage in "substantial gainful employment." In other words, Speier had the burden to show that, despite her medical condition, Pamela Rolland had the ability to: (1) perform meaningful mental or physical work-related activity; (2) in a competitive or self-employed position; (3) that normally results in pay or profit. *Rostler,* 169 B.R. at 413.

At the hearing, Speier did not offer testimony concerning Pamela Rolland's physical and mental ability at the time of bankruptcy to derive a regular income from employment. Instead, Speier pointed to Schedule I in which Pamela Rolland stated under penalty of perjury that she had been "self-employed" for "1 year" prior to bankruptcy, listed her occupation as "horses," and disclosed monthly gross income of "$4,500." Pamela Rolland also disclosed in Schedule J a monthly expense of $688.50 for "self-employment tax." Schedule J further revealed that the Debtors did not anticipate any monthly medical expenses on the petition date, notwithstanding Dr. Wareham's testimony that Pamela Rolland had "appointments with

---

**28.** Speier did not introduce evidence of the Debtors' testimony at the meeting of creditors in support of his objection to Debtors' amended claim of exemption.

**29.** Declaration of Julie Wareham, M.D. in support of Opposition to Chapter 7 Trustee's Objection to Debtors' Amendment to Schedule C, p. 2, l. 3–5.

**30.** *Id.* at p. 2, l. 8–10.

**31.** Declaration of Jan Winters, M.A., M.F.T. in support of Opposition to Chapter 7 Trustee's Objection to Debtors' Amendment to Schedule C, p. 14, l. 9–17.

her psychologist approximately four times a month and her psychiatrist approximately ten times a year." [32] Debtors did not dispute Speier's assertion that neither the Debtors nor their counsel disclosed at the meeting of creditors any facts indicating either that Pamela Rolland suffered from a disability that allegedly impaired her ability to engage in "substantial gainful employment" [33] or that Debtors had incurred regular monthly medical expenses since October 2000 as a result of her condition.

Debtors claim that the employment information concerning Pamela Rolland contained in Schedules I and J is incorrect, and that they "are in the process of amending their schedules to correct these unintentional misstatements." [34] Neither Schedule I or J, however, has been amended by the Debtors. Notwithstanding their prior admissions in Schedules I and J, Debtors submitted evidence at the hearing seeking to contravene the disclosures made under oath in their schedules and statements. While admitting that Pamela Rolland had the intention of starting " 'a new business with horses' " at the time the petition was drafted, Tony Rolland testified that the horse business "never came to fruition." [35] He further testified that Pamela Rolland has been unemployed since September 30, 2000, and "unable to provide any meaningful assistance for the family business." [36] Pamela Rolland did not testify at the hearing. Debtors offered the testimony of Dr. Wareham, who concluded that Pamela Rolland's depression was such that "it would be unlikely for her to sustain employment." [37] Debtors also pointed to a handwritten letter from Jan Winters to the Superior Court of California, County of Riverside, dated January 14, 2003, requesting that Pamela Rolland be excused from jury duty due to her mental condition. Debtors reason that "if she was unable to sit on a jury she was unable to sustain gainful employment." [38] Finally, Debtors dismiss the fact that Pamela Rolland's ongoing medical expenses were not disclosed in Schedule J, arguing that all of the expenses have been covered by insurance. No evidence was offered by the Debtors to support this assertion.

 Statements in bankruptcy schedules are executed under penalty of perjury and, when offered against a debtor, are eligible for treatment as judicial admissions. *Larson v. Groos Bank, N.A. (In re Larson)*, 204 B.R. 500, 502 (W.D.Tex.1996); *Vanguard Airlines, Inc. v. Int'l Aero Components, Inc. (In re Vanguard Airlines, Inc.)*, 298 B.R. 626, 635 (Bankr.W.D.Mo.2003); *In re Kaskel*, 269 B.R. 709, 715 (Bankr.D.Idaho 2001); *In re Bohrer*, 266 B.R. 200, 201 (Bankr.N.D.Cal. 2001). "Judicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and

**32.** Declaration of Julie Wareham, M.D. in support of Opposition to Chapter 7 Trustee's Objection to Debtors' Amendment to Schedule C, p. 3, l. 2–3.

**33.** Opposition to Chapter 7 Trustee's Objection to Debtors' Amendment to Schedule C, p. 2, l. 25

**34.** *Id.* at p. 7, l. 18–19.

**35.** Declaration of Tony Rolland in support of Opposition to Chapter 7 Trustee's Objection

to Debtors' Amendment to Schedule C, p. 10, l. 12–14.

**36.** *Id.* at p. 10, l. 2–3

**37.** Declaration of Julie Wareham, M.D. in support of Opposition to Chapter 7 Trustee's Objection to Debtors' Amendment to Schedule C, p. 2, l. 11–12.

**38.** Opposition to Chapter 7 Trustee's Objection to Debtors' Amendment to Schedule C, p. 8, l. 2–3.

dispensing wholly with the need for proof of the fact." *Am. Title Ins. Co. v. Lacelaw Corp.,* 861 F.2d 224, 226 (9th Cir.1988), *quoting In re Fordson Eng'g Corp.,* 25 B.R. 506, 509 (Bankr.E.D.Mich.1982). Judicial admissions are conclusively binding on the party who made them. *Am. Title Ins.,* 861 F.2d at 226; *Fordson,* 25 B.R. at 509. Even when schedules are amended, the old schedules are subject to consideration by the court as evidentiary admissions. *Kaskel,* 269 B.R. at 715; *Bohrer,* 266 B.R. at 201.

■■■■ Debtors repeatedly argue that they relied on "prior counsel" to prepare their bankruptcy documents, so they should not be "victims" of "inadvertent mistakes in their petition and schedules."[39] However, Debtors control the schedules and it is undisputed that Debtors have taken no action to amend Schedules I and J since the documents were signed under penalty of perjury and filed with the court on April 10, 2003. Debtors bear the ultimate responsibility for correcting inaccurate or incomplete information in their schedules and statements. As previously stated, the trustee and parties in interest should be able to determine whether an exemption claim is valid simply by reading the debtor's schedules. *Hyman,* 967 F.2d at 1319–20 n. 6; *Mohring,* 142 B.R. at 395. Ambiguities caused by errors or omissions in the schedules and statements must be strictly construed against them. As the court observed in *Bren:*

> To allow debtors to ignore the seriousness of their oath, submit documents to the court which contain numerous material inaccuracies, and, when the inaccuracies are discovered, excuse their behavior because they claim they failed to read the documents before signing them under oath, would undermine the whole structure of the system.

303 B.R. at 616. If the Debtors planned to amend Schedules I and J, they should have done so before their current Schedules I and J became judicial admissions. *See, e.g., Larson,* 204 B.R. at 502 n. 3 (rejecting debtor's asserting that he could avoid the judicial admission by simply amending his schedules); *In re Leonard,* 151 B.R. 639, 643 (Bankr.N.D.N.Y.1992) (stating that if debtors had a legitimate dispute concerning the extent or validity of a mortgage lien, they had the opportunity and obligation to amend their schedules between the filing of the petition and the hearing on the motion).

■■■■ Although the schedules and statements do not contain specific binding admissions regarding Pamela Roland's medical condition, Debtors admitted in Schedules I and J that Pamela Rolland had the ability to derive income from self employment in a meaningful work-related activity at the time of bankruptcy.[40] Be-

---

**39.** *Id.* at p. 4, l.19–22; p. 5, l. 7–8; p. 7, l. 1–2. Debtors attempt to blame "prior counsel" for the sad state of their schedules and statements misses the mark. As previously noted, Barth was, and continues to be, a co-counsel for the Debtors in this case. Barth was the Debtors' attorney of record upon the commencement of the case, and has continued to represent the Debtors in association with the law firm of Marshack Shulman Hodges & Bastian LLP. Notwithstanding the fact that Barth may have prepared the documents, Debtors have an independent duty to verify the accuracy and completeness of their peti-

tion and schedules. *See Duplante,* 215 B.R. at 447 n. 8; *Pettey,* 288 B.R. at 21; *Downey,* 242 B.R. at 15.

**40.** Debtors' judicial admissions in Schedules I and J are bolstered by the following evidentiary admissions contained in Debtor's Statement of Financial Affairs filed on April 17, 2003:

> a. Debtors disclosed under penalty of perjury in response to Question #1 of the Statement of Financial Affairs that they received gross income of $4,500 attributable

cause the statements under penalty of perjury in Schedules I and J constitute judicial admissions that are conclusively binding on the Debtors, the court finds that Speier has satisfied his burden of proving that Pamela Rolland, despite her medical condition, was able to maintain substantial gainful employment at the time of bankruptcy.

 "The Bankruptcy Code is designed to ensure that deserving debtors receive a 'fresh start' by requiring them to provide complete, accurate, and reliable information at the commencement of the case, so that all parties may adequately evaluate the case and the estate's property may be appropriately administered. 'Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.'" *Bren,* 303 B.R. at 614, *quoting Boroff v. Tully (In re Tully),* 818 F.2d 106, 110 (1st Cir.1987).

### III. CONCLUSION

Based on the foregoing, the court sustains Speier's objection to the Debtors' amendment to Schedule C on July 21, 2004, claiming an increased homestead exemption of $125,000 pursuant to California Code of Civil Procedure section 704.730(a)(3)(B) as having been proposed by the Debtors in bad faith. Alternatively, Speier's objection to the Debtor's increased homestead exemption is sustained because both requirements for an exemption under California Code of Civil Procedure section 704.730(a)(3)(B) have not been satisfied.

---

to "Pam Rolland Horse Business" between January 1 and April 30, 2003.
b. Debtors further disclosed under penalty of perjury in response to Question # 19A that Pamela Rolland had "kept or supervised the keeping of account and records of the debtor" from 1996 to the date of bankruptcy.

A separate order will be entered consistent with this opinion.

---

c. Debtors disclosed under penalty of perjury in response to Question # 19B that Pamela Rolland "audited the books of account and records, or prepared a financial statement of the debtor" from 1996 to the date of bankruptcy.